**BIG O TIRE DEALERS, INC., a Colorado Corporation, Plaintiff,**

v.

**The GOODYEAR TIRE & RUBBER COMPANY, an Ohio Corporation, Defendant.**

**Civ. A. No. 74–M–1106.**

United States District Court, D. Colorado.

Feb. 13, 1976.

---

**6.** Duluth's motion for reimbursement for temporary water filtration expenses will be decided by a separate order.

Michael C. Schaefer and Duane Burton of Burton, Crandell & Polumbus, Denver, Colo., for plaintiff.

William E. Schuyler of Schuyler, Birch, Swindler, McKie & Beckett, Washington, D. C., Arthur K. Underwood Jr., and W. David Pantle of Dawson, Nagel, Sherman & Howard, Denver, Colo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM OPINION AND ORDERS

MATSCH, District Judge.

Plaintiff, Big O Tire Dealers, Inc. (hereinafter "Big O"), a Colorado corporation with its principal place of business in Englewood, Colorado, filed the complaint initiating this action on November 27, 1974. The defendant, The Goodyear Tire & Rubber Company (hereinafter "Goodyear"), is an Ohio corporation with its principal place of business in Akron, Ohio. The original complaint alleged Big O's ownership of a trademark BIG FOOT[1] for automobile tires and it claimed relief from Goodyear for false designation of origin under 15 U.S.C. § 1125(a), because of Goodyear's use of the same trademark in connection with tires. A claim for common law trademark infringement was also alleged with jurisdiction based on diversity of citizenship, 28 U.S.C. § 1332. There is no question about jurisdiction over the subject matter and the parties.

The plaintiff made a timely jury demand. A motion for preliminary injunction was heard and denied in January, 1975. The evidence presented at that hearing was conflicting on a number of issues and, because the court could not anticipate the jury's findings, there could not be a determination that the plaintiff would ultimately prevail. Additionally, the plaintiff was considered to have an adequate remedy in the claim for damages.

The plaintiff was formed in 1962 and it engaged in the business of providing merchandising techniques, advertising concepts, operating systems and other aids to approximately 200 independent retail tire dealers in 14 states, who identified themselves to the public as Big O

---

1. Throughout this opinion, BIG FOOT is the spelling used to indicate the plaintiff's use and BIGFOOT is the spelling used by the defendant.

dealers. These stores sold replacement tires in the retail market using the Big O label on "private brand" tires made by one or more of the major tire manufacturers. These dealers also sold other companies' brands such as B. F. Goodrich and Michelin tires.

In the fall of 1973, Big O had Admiral Company manufacture tire molds for two tire models. One of those was designed to produce a tire with raised white lettering on the sidewall saying "Big O BIG FOOT 60". The other was designed to produce such a tire saying "Big O BIG FOOT 70". Uniroyal manufactured tires with these molds and the first shipment of such tires occurred in interstate commerce in February, 1974. Such tires were prominently displayed at a convention of Big O tire dealers in Reno, Nevada in March, 1974. Big O dealers began the sale of such tires to the public in April, 1974.

The defendant is the world's largest tire manufacturer, selling its tires to automobile makers as original equipment and selling to dealers in the replacement tire market. With respect to the replacement market, sales are made through a nationwide network of company owned stores, franchise dealers and independent retailers. In early 1974, Goodyear began making a new radial tire for the original equipment market. Because that new radial tire was thought to have better wet traction characteristics than Goodyear's other tires, an advertising agency was employed to develop a promotional program with that emphasis for the replacement tire market in June, 1974. This tire model was named "Custom Polysteel Radial" and that name was molded into the tire's sidewall.

Beginning in September, 1974, Goodyear launched a massive advertising program using television commercials, magazine and newspaper advertising and point of sale material, all using the word BIGFOOT in connection with this Custom Polysteel Radial tire. Goodyear had invested approximately $5,000,000. in

BIGFOOT advertising up to the time of the preliminary injunction hearing.

In refusing injunctive relief, this court observed that the crucial questions of fact to be resolved by the jury included these: Was BIG FOOT merely descriptive as applied to automobile tires? If so, had Big O established a secondary meaning? Was there a likelihood of confusion as to the source of origin of the tires made by Goodyear and the tires sold by Big O dealers? Did the defendant have a prior right to the use of BIGFOOT for tires as a result of its use of BIGFOOT on snowmobile replacement track?

Following a series of motion hearings and pre-trial conferences, the case was tried to a jury for ten days. After three days of deliberation, a verdict was returned on September 4, 1975. During the course of the trial, counsel for both parties submitted many proposed instructions and a number of conferences were held on the subject of instructions. All counsel were given a full opportunity to consider, comment upon and make record objections to the instructions prepared by the court. By agreement of counsel, copies of the instructions as read were given to each juror for use in deliberation.

A set of those instructions which the court specifically designed for this case, bearing numbers 1 through 22, and a copy of the verdict are attached as Appendix I. The jury was asked to consider and separately determine three theories of liability, identified in the form of verdict as trademark infringement, false designation of origin and trademark disparagement.

The elements of the claim for a common law trademark infringement and the defenses to that claim were given in Instructions 3 through 13.

The elements of a claim for recovery on the theory of a false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), were given in Instruction 14.

What this court chose to call "trademark disparagement" was a theory given

in Instructions 16 through 20. This theory of recovery did not appear in the plaintiff's original complaint and it was not contained in the amended complaint filed in December, 1974. In fact, the plaintiff never articulated such a theory prior to the trial of this case. Plaintiff's counsel did make an oral motion to amend the complaint to conform to the evidence. Such a motion was not necessary under F.R.C.P. 15(b) because defense counsel were well aware of the factual and legal questions involved in the case. This procedure could not have prejudiced the defendant. As a result of the extensive pre-trial conferences and other hearings preliminary to the jury trial, the defendant was made fully aware of the evidence which the plaintiff intended to introduce and the operative facts which it intended to establish by that evidence. There is nothing to indicate that the conduct of this trial would have been different in any respect if this theory of relief had been fully described in the plaintiff's complaint.

The jury found for the plaintiff on the claim of liability for trademark infringement, for the defendant on the claim of liability for false designation of origin and for the plaintiff on the claim for trademark disparagement. Compensatory damages of $2,800,000. and punitive damages of $16,800,000. were awarded. Those damages were available under either of the two theories of liability on which the plaintiff prevailed.

It remains for the court to consider the equitable claims in the case and a number of post verdict motions. In deciding these questions, the court is bound by the facts determined by the jury to the extent that such facts may be inferred from the form of the verdict. It would be an invasion of the province of the jury and a denial of the right to trial by jury for the court to make any findings in conflict with the verdict when it is supported by the evidence. That is true in this case.

It is difficult to infer a set of ultimate facts from the verdict of liability on the claim for common law trademark infringement. Obviously, there must have been a finding that both Big O and Goodyear made a trademark use of BIG-FOOT (BIG FOOT) in connection with automobile tires. It is equally obvious that the jury must have found that Big O had established BIG FOOT as a trademark for its tires before September 16, 1974 and that Goodyear, in its advertising and sales program beginning with a nationwide telecast on September 16, 1974, used BIGFOOT in a manner likely to cause confusion among persons using ordinary care and prudence in the purchase of tires.

Because of the conflicting evidence on the issue, it is impossible to determine whether the jury found that BIG FOOT was merely a descriptive word for which Big O developed a secondary meaning before September 16, 1974 or whether the finding was that BIG FOOT was sufficiently distinctive to be a trademark.

To reach the result of liability for infringement, the jury necessarily had to reject the affirmative defense of extension or expansion to related products which Goodyear claimed for its earlier use of BIGFOOT on replacement snowmobile track belts. They could have done so on one of several findings: that Goodyear did not have a valid trademark for snowmobile track belts; that track belts and automobile tires are not related products; that Goodyear's use of BIGFOOT for snowmobile track belts was only a token use and that the trademark use of BIGFOOT for snowmobile track belts was abandoned by Goodyear.

A review of the elements of the claim for false designation of origin under § 43(a) of the Lanham Act contained in Instruction 14 and a comparison of those elements with the instructions for common law trademark infringement give rise to the deduction that in finding for the defendant under the Lanham Act claim, the jury concluded that the plaintiff failed to show that Goodyear's use of BIGFOOT in connection with automobile tires constituted a false representation with respect to the origin of the tires

sold by Goodyear. In short, the jury found that there was no passing off of Goodyear tires as being from an origin other than Goodyear.

To find for the plaintiff on the claim of trademark disparagement, the jury must have determined that Big O had established BIG FOOT as a trademark for automobile tires by September 16, 1974; that Goodyear published false statements to the plaintiff's customers or potential customers which could reasonably be understood to cast doubt upon or confusion about the validity of Big O's BIG FOOT trademark; that Goodyear acted with malice, intending to vex, injure or annoy Big O; and that these false statements had an adverse economic effect upon the plaintiff's business.

Because the questions of good faith and intentional injury are very relevant to the equitable issues now to be decided, it is appropriate for me to amplify the jury's ultimate conclusion upon the basis of the evidence received at the preliminary injunction hearing and the jury trial so long as the findings are consistent with the verdict.

In June, 1974, officials of Goodyear held meetings with representatives of Young & Rubicam, an advertising agency, to develop an advertising program for the promotion of the Goodyear Custom Polysteel Radial tire in the replacement market. At such a meeting on June 20, 1974, the advertising people suggested the BIGFOOT name to emphasize the width and traction of the tire. That idea was developed and evolved through a series of meetings in the summer of 1974 and on July 10, 1974 it was decided that the word BIGFOOT would become the central focus of a complete multi-media advertising program for this tire. Displays, brochures, signs and other point of sale material were designed and produced with that word in large, white, block letters. Mats were made for newspaper advertising. Full page and two page ads were designed for national magazines and television commercials were prepared.

The television commercials are of particular significance in this case. Both 60 second and 30 second commercials were produced. These commercials all follow the same format, using the style of a folk ballad talk song with dramatic photography of automobiles, equipped with these Goodyear tires, turning on wet mountain roads, crossing bridges and encountering various road hazards. The word BIGFOOT in large, white, block letters flashes on the screen with the sound of thunder. An unseen announcer interrupts to introduce the Custom Polysteel Radial from Goodyear while a picture of the tire is shown. After more of the talk song and photography emphasizing the wet traction characteristics of the tires the commercial is concluded with the Goodyear name and Goodyear logo displayed. To give maximum effect to the impact of this program, the advertising, marketing and distribution efforts of Goodyear were coordinated to be certain that the Custom Polysteel Radial tires were available at Goodyear stores and at the stores of Goodyear dealers at the time of this first use of the television commercials. To accomplish that, it was necessary to advise all store managers and dealers that this advertising program would take place and to have these tires in their inventories when it began. Mr. John Kelley, Goodyear's vice president for advertising, together with other Goodyear officials, were the speakers on a video tape which was played at meetings of Goodyear regional managers held in various places throughout the United States in August, 1974. In this presentation, Mr. Kelley explained the BIGFOOT advertising program.

There can be no better description of the scope, purpose and intent of Goodyear than the words used by Mr. Kelley in that presentation, a transcript of which is in evidence as Plaintiff's Exhibit 1824:

\*　　\*　　\*　　\*　　\*　　\*

First, we are putting six million dollars behind the launch between now and New Year's Day. That's about as much as we spent the entire first year

of POLYGLAS. With all that radial competition out there and on the TV tube, it takes that kind of money these days to break through the noise barrier and make a name for yourself.

Second, we are once again putting most of our marbles on TV, because no other advertising medium can be so efficient and so dramatic in helping us to establish the superiority of our new POLYSTEEL radial.

Third, we are going to back up the advertising right down the line with national magazine ads, newspaper announcements, radio spots, point of sale displays, product literature, promotional gimmicks, and sales training programs.

 * * * * * *

Okay. With all those steel belted radials already on the tube, just how are we going to position POLYSTEEL radials as something different from all the rest, and something strongly identified with Goodyear?

How are we going to do what we must do, break through the radial clutter?

Well, I would like you to take a real close look at a completely fresh and memorable kind of tire TV commercial. These aren't the finished and polished commercials you will see in September, but all the flavor and personality of the final versions are represented on these test commercials to give you a real good idea of the kind of excitement we are talking about. Let's watch.

 * * * * * *

Well, fellows, you have just heard the magic words "BIGFOOT, the POLYSTEEL radial from Goodyear; keeps its feet even in the rain," a distinctive and memorable name and consumer benefit.

That's the thumbnail description of our new tire we are counting on to set up apart from all the rest of the radials—"BIGFOOT, new POLYSTEEL radial from Goodyear; keeps its feet even in the rain."

These BIGFOOT commercials tested 50 per cent better than tire industry averages in the critical area of persuasiveness, and they tested a good one-third better than even last year's Steelgard commercials for establishing that our radial is different from other radials.

Starting on the NFL Monday Night Football Game of September the 16th, and roaring right on through the big year-end Bowl games, we will run 163 commercials in exclusive positions in major football and other prime time telecasts, and by "exclusive," I mean no other tire sponsors will be there to water down our story, . . .

 * * * * * *

Suffice it to say, that what all this means is that we will reach about 80 per cent of all the males in the USA about five times a month all during the fall introductory period.

You think they won't know about BIGFOOT? You bet they will!

I would like to point out on the schedule something new for 1974, our exclusive position in the ABC Sunday Night Movies, 1973 top-rated movie series on TV. We will be a part of such blockbusters as "The Poseidon Adventure," "Thunderball," "Summer of '42," "Airport," and other super movies.

We will reach millions on these Sunday nights and help us to catch some tire buyers who aren't necessarily football fans. [sic] What's more, we will be out of the tire clutter on Sunday football.

In addition to all that wonderful and expensive TV, we will be running introductory POLYSTEEL radial ads in nine national magazines where the most likely radial tire buyers are found: *Time, Newsweek, Sports Illustrated, U. S. News and World Report, Business Week, Road and Track, Motor Trend, Car and Driver, Hot Rod.* All these magazines are prime targets where readers will meet BIGFOOT in introductory ads. Copy in the introductory magazine ads stresses the im-

portance of POLYSTEEL'S advanced wet traction features.

\* \* \* \* \* \*

Goodyear did exactly what Mr. Kelley said it would do. The BIGFOOT promotion was launched on the Monday Night Football telecast by ABC on September 16, 1974 and all the other plans were implemented as scheduled. The fact that it was all done with the knowledge obtained as a result of intervening events is the cause of this lawsuit.

A district manager for Goodyear named Ray Engle observed a Big O BIG FOOT tire in Salt Lake City, Utah on Saturday, August 24, 1974. Because Mr. Engle had just returned from a district managers' meeting in Los Angeles where he had learned of Goodyear's BIGFOOT promotional plans, he immediately telephoned the Goodyear offices in Akron, Ohio. As a result of that Saturday telephone call, a meeting was held on Monday morning August 26, at which time Mr. Kelley was informed of the existence of the Big O BIG FOOT tire. Mr. Hook, Goodyear's trademark attorney, was immediately consulted. Mr. Hook and Mr. Kelley requested that Mr. Wilson Green, president of Lee Tire and Rubber Company, a Goodyear subsidiary, make a telephone call to Mr. Norman Affleck, the president of Big O. Mr. Green was selected for this contact because Lee Tire and Rubber Company manufactured tires for the private brands market and he was acquainted with Mr. Affleck. In that conversation, Mr. Green informed Mr. Affleck of Goodyear's intent to use BIGFOOT in promotional material for its Custom Polysteel Radial tire. Mr. Green asked Mr. Affleck to give Goodyear a letter indicating that Big O had no objection to this use of BIGFOOT. When Mr. Affleck replied that he could not make that decision alone and that he would have to know more about the matter to inform the Big O board of directors, Mr. Green suggested that Mr. Affleck talk to Mr. Kelley.

Mr. Affleck called Mr. Kelley. In that conversation, Mr. Kelley also asked for a letter indicating that Big O had no objection to Goodyear's use of BIGFOOT for a period of twelve months. In answer to Mr. Affleck's request for more information about the manner of that proposed use, Mr. Kelley said that Mr. Houlette, a Goodyear official, would visit with Mr. Affleck and show him samples of the kind of advertising materials which Goodyear was planning to use. Mr. Houlette did make that trip on August 30, 1974 and he did display that material to Mr. Affleck, including rough versions of the television commercials. When Mr. Affleck indicated his concern that this material would be damaging to Big O, Mr. Houlette suggested that it might help Big O and he said that plates for ads had already been sent to national magazines.

Mr. Affleck then called Mr. Kelley again to advise that there definitely was a problem to be discussed. They agreed to meet during the convention of the National Tire and Retread Dealers Association in New Orleans on September 10, 1974. Mr. Affleck was accompanied by two Big O directors, Mr. William Thomas and Mr. Guy Burgess. Goodyear was represented by Mr. Kelley and Mr. Lee McDonald, manager of consumer market planning. At that meeting, Mr. Affleck displayed a Big O BIG FOOT tire. The particular tire seen by Mr. Kelley and Mr. McDonald was identical with those being sold through the Big O organization except that it also had two raised white footprints on the sidewall because Big O was then considering that as an addition to its tire design. The words Big O BIG FOOT were in raised white letters on the sidewall of the Big O tire.

Mr. Affleck and his area directors told Mr. Kelley and Mr. McDonald that Big O objected to any use by Goodyear of the word BIGFOOT in connection with automobile tires. Mr. Affleck pointed out that the Big O dealers' organization would be severely damaged if the dealers came to the conclusion that Big O

was not able to protect an exclusive right to the use of this trademark. The Big O representatives also made it clear that they were not interested in money; but, that they were concerned about preserving an exclusive use of this trademark. They requested Goodyear to withhold this advertising. Mr. Kelley and Mr. McDonald said that the Goodyear program was too expensive and too far along to stop. They explained that advertising had been arranged for national magazines and that the point of sale materials had been distributed. The Big O representatives indicated an understanding of the problem and asked what amount of time would be required to terminate the program. The Goodyear answer was indefinite and uncertain but there was a suggestion that several weeks would be required to wind it down. Mr. Kelley said that he would have to discuss this matter with other officers and reply to Big O at a later time.

Mr. Kelley reported the results of this New Orleans meeting to Mr. Charles Eaves, Goodyear's executive vice president for sales. Mr. Eaves decided that Goodyear would go forward with the BIGFOOT campaign and so informed Mr. Kelley.

On September 17, 1974, Mr. Affleck wrote a letter to Mr. Kelley. In that letter, Mr. Affleck set out his understanding that as a result of the New Orleans meeting, Goodyear would end its BIGFOOT campaign as soon as possible. Because he had received no new information, Mr. Affleck then called Mr. Kelley on September 26, 1974. Mr. Kelley said he had written a letter advising that Goodyear had decided to go ahead with its plans for this promotion. When Mr. Affleck objected, Mr. Kelley suggested a talk with Mr. Eaves.

Mr. Kelley's letter, dated September 20, 1974, responded to Mr. Affleck's letter of September 17. After denying any commitment to discontinue use of BIGFOOT, Mr. Kelley wrote:

\* \* \* \* \* \*

We believe Goodyear has a clear right to use the BIGFOOT name in connection with tires in view of our established use of this name on a closely related product line. On the other hand, we did indicate to you that we consider BIGFOOT a nickname which we are using as a means of quickly personalizing our new Polysteel radial tire, rather than the official name of the tire itself. In this context, we intend to continue to use BIGFOOT in this manner for as long as our research indicates that it is a helpful advertising device.

\* \* \* \* \* \*

[Defendant's Exhibit 2647]

After the telephone conversation of September 26, Mr. Kelley sent another letter, dated October 2, 1974, repeating Goodyear's intent to use BIGFOOT. [Plaintiff's Exhibit 1801] In that letter he suggested that Goodyear may challenge Big O's right to make any use of that name on a tire.

On October 10, 1974, Mr. Affleck talked with Mr. Eaves by telephone. In that conversation, Mr. Eaves was firm in restating Goodyear's position that it was going forward with the use of the BIGFOOT name in its promotion of the Custom Polysteel Radial tire. He told Mr. Affleck that Big O had failed to protect itself by spending the money to register the name and that he was confident of Goodyear's legal position. Mr. Eaves did indicate that Goodyear would like to avoid giving the appearance of being unfair and that he did not want to have any "David and Goliath" publicity in trade publications. Mr. Eaves suggested that there could be financial arrangements to "ease your pain" and to assist Mr. Affleck in his position with his board of directors. Mr. Eaves said that because Goodyear could not let go of its massive investment in the BIGFOOT campaign, there were only three possible solutions. First, Big O could discontinue the use of BIG FOOT on its tires. Mr. Eaves said that Goodyear would be willing to make some payment to reimburse

Big O for its investment and expenses and something for damaged feelings. No amount was discussed. The second option was concurrent use of BIGFOOT (BIG FOOT) by Big O and Goodyear. Mr. Eaves also indicated that Goodyear would be willing to make some payment under that situation but it would be worth more to Goodyear if Big O discontinued its use. The third possibility was to have the matter go into litigation with either party initiating a suit. Mr. Eaves said that Goodyear would wish to avoid litigation but that if Big O did sue the case would take long enough to go through court that Goodyear may well have obtained all of the benefits from the name during that time.

During this conversation Mr. Affleck told Mr. Eaves of the concern that the effect of any use by Goodyear would be to shake the confidence of dealers in the ability of the management of Big O to protect them. Mr. Affleck suggested a joint meeting of the boards of directors of the two organizations. That was rejected by Mr. Eaves.

The Custom Polysteel Radial tire of Goodyear was distributed and sold throughout the United States with the use of the BIGFOOT advertising. The jury's conclusion that this constituted a trademark use of BIGFOOT for this tire by Goodyear is amply supported by the evidence. This massive advertising undertaking continued and carried through the time of the jury trial in this case. At that time Goodyear had made a total investment of approximately $10,000,000. in the BIGFOOT advertising campaign.

The evidence presented to the jury did establish actual confusion among the consuming public as a result of the concurrent use of the BIGFOOT (BIG FOOT) trademark. That confusion took several different forms. Persons who had already purchased Big O BIG FOOT tires before September 16, 1974 thought that their tires were made by Goodyear for Big O. Big O tire customers asked their dealers whether they were associated with Goodyear. Other customers of Big O wondered how two companies could use the same name as a trademark for tires. There was testimony from consumers about their confusion as to who really owned the trademark BIGFOOT (BIG FOOT) and which company had it first.

One significant effect from concurrent use was confusion resulting from the difference in construction of the tires sold by the two companies. The Goodyear tire was a radial tire and Big O sold bias belted tires. The evidence showed that potential customers came to Big O dealers asking for BIGFOOT (BIG FOOT) tires as a result of Goodyear's commercials. Big O salesmen then had to explain the difference in the construction of these tires. The necessity for such an explanation gave an obvious negative quality to such customer contacts.

Because of the apparent and known difference in size between the companies, it was a reasonable and a natural consequence for people to assume that Goodyear had the exclusive legal right to the use of BIGFOOT as a trademark and that Big O was using that trademark illegally. That did, in fact, occur. The clearest and most graphic illustration in the testimony was that when a Big O dealer attempted to place a display ad in the yellow pages of a telephone directory, using the phrase "Home of BIG FOOT", the telephone company's representative told him that it could not be done because the name BIGFOOT belonged to Goodyear.

This implication of a wrongful and dishonest use of BIG FOOT by Big O arose not only from the continued and voluminous advertising use of BIGFOOT by Goodyear; it was also created by the content of these advertising messages. The initial full page ads appearing in national magazines and trade journals in September, 1974 used the phrase "Introducing BIGFOOT—the Polysteel Radial from Goodyear". [Defendant's Exhibit 247] In a typical television commercial, the initial use of BIGFOOT in the talk song was accompanied by the appearance of the word BIGFOOT in bold, white, block letters on the screen and the sound

of thunder. Immediately following that was a close-up picture of the tire on a car moving on a wet surface with the audible announcement, "Introducing the new Polysteel Radial from Goodyear". [Defendant's Exhibit 194]

In television commercials produced and shown after this lawsuit began, the announcer ended with the statement, " 'BIGFOOT' the new Polysteel Radial . . . only from Goodyear", while the screen showed "BIGFOOT The Polysteel Radial" followed by the Goodyear logo. [Plaintiff's Exhibit 1458–A, GTAY 3614] The name and logo of Goodyear were prominently displayed in all of the advertising.

Having unleashed this extraordinary effort to identify the name BIGFOOT with this Goodyear tire and the defendant company, after learning of the Big O BIG FOOT tires, the officers of Goodyear must be presumed to have foreseen that one of the consequences of such concurrent but disproportionate use would be the creation of an innuendo that Big O was trading off of Goodyear in violation of the law.

Goodyear's use of BIGFOOT had a devastating impact on the independent dealers in the Big O organization, many of whom testified at the jury trial. They said that when they first saw the Goodyear advertising, they were shocked, angered and amazed that this use of BIGFOOT was being made. These dealers had understood that BIG FOOT was the exclusive property of Big O as a result of their dealer meeting in Nevada in March, 1974. They were all quite conscious of the difficulty which they had as small, independent retailers in competing with the large tire manufacturers such as Goodyear. Their attitude was defensive and they all expressed a great sensitivity about being able to operate independently and effectively. They also appeared to be in a close alliance through communications with the plaintiff company.

While these differing types of confusion did exist, there is no evidence that any direct economic losses resulted. The plaintiff did not produce evidence of lost sales of Big O tires or any other type of lost income. Moreover, the evidence is clear that no dealers were lost and, indeed, new dealers were added to the organization during the time of this concurrent use.

In discussing the inferences to be drawn from the jury's verdict, I observed that there is no way to determine the jurors' view of the defendant's affirmative defense based upon its prior use of BIGFOOT as a trademark for snowmobile track. Because that defense does relate to the matters which I must now determine it is necessary for me to make a definitive ruling on it from the evidence presented at the jury trial and the preliminary injunction hearing.

■ In a production run for two or three months in 1973, Goodyear manufactured 671 units of track belts for replacement use on snowmobiles. In that manufacture they used molds which caused the word BIGFOOT to appear in raised lettering on the track and they also caused human type footprints for left and right feet to appear on the track in such a manner that when the snowmobile was operated footprints would be left in the snow. Goodyear filed for a registration for use of BIG-FOOT as a trademark for snowmobile track in December, 1973 and such a registration was obtained on October 15, 1974. These 671 BIGFOOT snowmobile track belts were specifically designed as replacements for two models of the Ski-Doo vehicle made by Bombardier and they could not be used on other snowmobiles. The BIGFOOT track belts were a very small part of Goodyear's snowmobile track production, most of which was sold to manufacturers as original equipment. Not all of the 671 were sold or even shipped and Goodyear has not made a single BIGFOOT snowmobile track since 1973.

The sales which were made were to various types of retail stores in states with substantial snowfall. The only relationship between snowmobile track belts and automobile tires is that they

are manufactured in a somewhat similar process using some of the same raw materials and they are used on land surface vehicles. While the defendant was able to show that, coincidentally, some snowmobile track belts are sold by some of the same dealers who sell automobile tires, these products are not sold through the same channels of trade distribution.

Automobile tires and snowmobile track belts are not advertised, promoted and marketed in the same manner and the BIGFOOT mark as used on snowmobile track belts is not particularly distinctive.

In my view, there is not a likelihood of confusion of the origin of BIGFOOT snowmobile track and BIGFOOT in connection with automobile tires. It is my conclusion that the use of BIGFOOT for snowmobile track by Goodyear was no more than a sporadic, casual and transitory use which was not part of an ongoing program to exploit it as a trademark. Accordingly, it was only a token use which did not create a trademark right of exclusive use. Moreover, the lack of sales, the failure to advertise or promote the BIGFOOT snowmobile track belts and the failure to resume manufacture of it must be considered to constitute an abandonment of the name BIGFOOT for snowmobile track before Big O's use of BIG FOOT for automobile tires.

### DEFENDANT'S MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR FOR A NEW TRIAL

Because the defendant's motions for judgment notwithstanding the verdict under Rule 50(b) or, alternatively, for a new trial under Rule 59 raise a number of common issues, they may be considered together. It is asserted that the verdict must be set aside because there was no reasonable basis for the jury to measure any reduction in the value of the plaintiff's goodwill and that the evidence does not support the compensatory damage award. The jury found general compensatory damages in the amount of $2,800,000. pursuant to Instruction 21.

There, the jury was told that the plaintiff was not seeking recovery for lost sales, past or future, and that the measure of the plaintiff's damage was the difference between the value of its goodwill before and after the acts of the defendant. Specifically, the jury was instructed that damages could be awarded on the plaintiff's contention that it would be required to conduct an informational advertising campaign "to place Big O Tire Dealers, Inc. in whatever position with respect to the word BIG FOOT for tires that it may have enjoyed prior to September 16, 1974."

The amount of the award of compensatory damages leads to the logical inference that the jury accepted the claim that advertising was the appropriate way for the plaintiff to repair the damage to its goodwill. The evidence showed that there were Big O Tire Dealers in 14 of the 50 states. 14 is 28% of 50. Goodyear spent $10,000,000. in saturation advertising of BIGFOOT. 28% of $10,000,000. is $2,800,000., the amount of the award. While there is authority for such a measure of damages in the trade libel or business disparagement cases to be considered later in this opinion,[2] I know of no direct precedent for this measure of damages in a trademark infringement case. I also am unaware of any case with comparable facts.

The usual trademark infringement case involves a claim by a plaintiff, with a substantial investment in a well established trademark for particular products, to recover for the loss of income as a result of a second user attempting to trade on the goodwill associated with that established mark, by suggesting to the consuming public that his products come from the same origin as those of the plaintiff. Clearly, Goodyear did not make any effort at such deception and the jury found that there was no false designation of origin in violation of the Lanham Act.

The uniqueness of this case results from a combination of circumstances.

2. See discussion at pages 1234–1235, *infra.*

Goodyear is a very large corporation with enormous economic capacity. Television is a medium of communication, visually and audibly, which is capable of capturing the attention of a nationwide audience at a single point in time. Professional football games generate enough interest, nationwide, to attract a very large number of viewers for a telecast. In 1974, Monday Night Football was a program with a particularly large audience appeal. Thus, by its commercials run during the course of that single telecast on September 16, 1974, Goodyear successfully associated the name BIG-FOOT with its tires in the minds of a large number of people.

The result was that actual confusion about this trademark was created literally overnight. It is true that this confusion was not shown to have resulted in persons buying from Goodyear upon the mistaken belief that they were buying a product sold by Big O. That cannot, however, become the sole basis for liability for trademark infringement. To permit Goodyear to act in blatant disregard of the plaintiff's position merely because it did not pass off its tires as Big O's would eliminate the protection of a business in the property right to identify itself and its products to the public. While the mere difference in size and economic power between competitors is not unfair, the competition becomes unfair if that power is used with a complete disregard of the property rights of the smaller company. There is adequate evidence for the jury to conclude that the result of Goodyear's advertising was the destruction of the ability of Big O to make any effective use of BIG FOOT to identify its products or its company as a source of such products. The destruction

of a trademark must surely be an infringement of it.

In this case there were no claims for out of pocket expenses or for lost earnings. Yet, it is clear that the plaintiff was injured. Whether the wrong done by Goodyear should be characterized as common law trademark infringement or trademark disparagement, the result of it has been confusion in the minds of the public with respect to the relationship between Big O and Goodyear. That confusion did not exist before September 16, 1974. That confusion is, in itself, damage. The appearance of dishonesty and wrongful conduct by Big O harms its reputation within the trade and with the public. It is reasonable to redress that wrong by giving the plaintiff enough money to conduct an advertising program of its own. Such an award of damages is consistent with the general measure of damages for any tort which, as stated in Instruction 21, is the amount necessary to make the victim whole.[3] The damages awarded by the jury would enable Big O to do an equivalent volume of advertising in the states in which there are Big O dealers to inform their customers, potential customers, and the public as a whole about the true facts in this dispute or anything else necessary to eliminate the confusion. Whether Big O actually uses the money for that purpose or any other purpose is as irrelevant as whether a personal injury claimant uses his damage award to pay past or future medical and hospital expenses.

What is relevant is that in this case the *fact of damage* has been established with reasonable certainty. There is no doubt that Big O's trademark was af-

---

**3.** The defendant argues that there is no precedent for such an award and cites *Aladdin Mfg. Co. v. Mantle Lamp Co.,* 116 F.2d 708 (7th Cir. 1941) as authority disapproving of this theory of recovery. In that case, an infringer was required to account for its profits and a special master's recommendation that advertising expenses of the infringer should be added as exemplary damages was rejected. The court did not consider any claim for recovery of the cost of protective advertising by the victim of

the infringement. The case is irrelevant. It should be noted that in the same circuit it was recognized that this kind of advertising can be considered as an element of actual damage in a business disparagement case. See *Maytag Co. v. Meadows Mfg. Co.,* 45 F.2d 299 (7th Cir. 1930). That is consistent with the holding in this circuit in *Ira M. Petersime and Sons v. Robbins,* 81 F.2d 295 (10th Cir. 1936). These cases are discussed more fully at pages 1234–1235, *infra.*

fected by Goodyear's $10,000,000. advertising program. Moreover, there is a basis for the jury's determination of the *amount* of damage because the $2,800,-000. is 28% of the $10,000,00. expended by Goodyear. In antitrust cases, it has often been held that, where the evidence shows the fact of damage, there can be recovery even though there is no clear standard for measuring the extent of the injury. The rationale for this approach is that "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). The Tenth Circuit has recognized the applicability of this reasoning in a business disparagement case, *Stoody Co. v. Royer*, 374 F.2d 672 (10th Cir. 1967), and it is certainly appropriate in this case.

■ The defendants have attacked the award of punitive damages by contending that there was insufficient evidence of evil intent to justify any award of such damages. The jury in this case was instructed in accordance with Colorado law. 1973 C.R.S. § 13–21–102. The approved instruction implementing that statute appears in *Colorado Jury Instructions,* 1975 Supplement, Instruction 5:3. It requires a finding beyond a reasonable doubt that the injury complained of was attended by circumstances of fraud, malice, or a wanton and reckless disregard of the rights and feelings of the plaintiff. Viewing the award of punitive damages in this case as relating to the trademark infringement claim, it is not necessary that there be proof of "evil intent" because malice is not an element of that claim. The jury finding of punitive damages on that claim is supported if the evidence is sufficient to warrant a determination beyond a reasonable doubt that Goodyear acted with a wanton and reckless disregard of the rights of the plaintiff. The evidence is adequate for that finding. Goodyear was made well aware of plaintiff's position at least by September 10 and there was adequate time to remove the infringing use of the trademark before the September 16 telecast.

What Goodyear did was to determine that the plaintiff was an insignificant competitor and that Goodyear's investment of time, money and effort was too great to give up the use of the BIG-FOOT material even though it would clearly damage and perhaps destroy the plaintiff's use of its trademark. Goodyear then proceeded with an intentional and deliberate infringement of the plaintiff's trademark. In short, Goodyear elected to ignore completely the property rights of Big O. It is difficult to characterize such conduct in any manner more favorable than as a wanton and reckless disregard of the plaintiff's rights.

The defendant argues that special damages are an essential element for liability on the theory of trademark disparagement and that there is no evidence of that type of damage in this case.

It must be observed that in giving Instructions 16 through 20, defining trademark disparagement, this court did not follow any direct precedent and none has been discovered since the trial. Yet, there is nothing which is really new or novel, conceptually, in the elements of this theory. The instructions are simply a synthesis of well established legal and equitable principles.

■ The law of defamation developed for the protection of reputation. A statement may be defamatory upon its face or the defamatory meaning may arise only as a result of extrinsic circumstances. Slander (oral defamation) does not generally give a basis for recovery unless there is a showing of pecuniary damage. Slander *per se* is actionable without proof of damage because it is the type of defamation which is of such a nature that injury to reputation is presumed and the jury is authorized to estimate the amount of that injury. See Prosser, *The Law of Torts,* §§ 112–113 (4th Ed. 1971). A slander which ascribes to another conduct, characteristics, or conditions incompatible with the proper

conduct of his lawful business, trade or profession, is slander *per se.* *Restatement of the Law of Torts,* § 573 (1938).

 Libel (written defamation) is actionable without any showing of special damages if the published statement is defamatory on its face. Libel *per quod* is that libel which becomes defamatory as a result of innuendo from other facts. The rules for slander apply to libel *per quod* and therefore, written defamatory publication is actionable without pecuniary injury if there is an imputation of conduct incompatible with the proper exercise of a lawful business. *Wegner v. Rodeo Cowboys Association,* 290 F.Supp. 369 (D.Colo.1968).

The law of defamation was extended to the protection of property several centuries ago through adoption of the doctrine of slander of title. Initially recovery was limited to falsehoods injurious to the ownership of land. More recently, recovery was recognized for injury to personal property and to any interference with the plaintiff's business resulting in some form of customer diversion. The word "disparagement" has been used to describe these various kinds of interference with commercial or economic relations through injurious falsehood. Prosser, *supra,* § 128.

The protection of business goodwill from the effect of false advertising was recognized by the Tenth Circuit Court of Appeals in *Paramount Pictures v. Leader Press,* 106 F.2d 229 (10th Cir. 1939). There, Judge Bratton said at pages 231–2:

. . . one without privilege so to do, has no right to issue and publish an untrue or deceptive statement of fact which has a disparaging effect upon the quality of another's property, under circumstances which would lead a reasonable person to foresee that it will have such effect. The making of such a statement in such circumstances is tortious. Cf. Restatement of the Law of Torts, § 626. And if the statement is understood as one of disparagement and the understanding is a reasonable construction of the language used, it is immaterial that the person making it did not intend it to be understood in that manner. Restatement, supra § 629 . . . .

The facts of this case fit within these traditional principles. Some of Goodyear's advertising expressly said that BIGFOOT tires were available only from Goodyear. All of it had the effect of creating that impression. Big O was selling and offering for sale tires called BIG FOOT. That extrinsic fact made Goodyear's advertising false. The additional extrinsic facts of the differences in the methods of advertising used by the two companies and the difference in their size, created the innuendo of an improper and unauthorized use of BIG FOOT by Big O. Big O had the exclusive right to the use of BIG FOOT as a trademark for tires. The result of the reasonable implication from Goodyear's advertising was the disparagement of Big O's trademark.

There is direct precedent for an award of damages resulting from false advertising based upon the time and effort spent by the plaintiff in counteracting the effects of the defamation. *Maytag Co. v. Meadows Mfg. Co.,* 45 F.2d 299 (7th Cir. 1930). There, the court said at page 302:

The evidence on the hearing under the reference included, in addition, testimony of appellee's sales representatives, showing the extent to which said propaganda had spread and the amount of time and effort spent by these representatives in attempting to counteract the effect of same. The master awarded $500,000. Appellee did not, and obviously could not, measure its damages by proof of loss of specific sales or general loss of business. Such evidence would necessarily be entirely speculative in character, so far as accurate measurement thereof is concerned. But the failure to show any general loss in business does not necessarily negative actual damage. Again, whether the development of the company, its natural growth, and conditions generally are such as to pro-

duce belief that the company would otherwise have grown much more rapidly, is manifestly speculative and argumentative. The master was necessarily confined to a consideration of the libelous propaganda that had been spread, the number of representatives of the appellant actually promoting its sales and the circulation of the unfair statements, evidence of the widespread character of the latter, and of the time and effort spent in counteracting same, and all of the circumstances concerning the difficulties which the circulation produced.

Such a recovery of the expenses of a party injured by defamation in publishing newspaper denials was also authorized in *Den Norske Amer. Actiesselskabet v. Sun Print. and Pub. Ass'n.,* 226 N.Y. 1, 122 N.E. 463 (1919). The Tenth Circuit has recognized a similar measure of damages in *Ira M. Petersime and Sons v. Robbins,* 81 F.2d 295 (10th Cir. 1936). More significantly, in that case the court recognized that expenses of counteracting a business disparagement qualified as special damages. Thus this circuit has impliedly stated that in a disparagement case special damages include any measurable adverse economic effects and that is consistent with what the jury was told in Instruction 17.

The only difference between those three precedents and this case is that Big O did not spend $2,800,000. in advertising to counteract the implication from the Goodyear advertising. It is clear from the record that Big O did not have the economic resources to conduct such a campaign. Upon competent evidence before it, the jury found that this was an amount reasonably necessary to recover Big O's position in the trademark BIG FOOT before September 16, 1974. Should the law apply differently to those who have the economic power to help themselves compared with those who must seek redress through the court? In my view, the answer most assuredly must be no and the evidence establishes that Big O did suffer measurable adverse economic effects from Goodyear's conduct. This meets any requirement of special damages.

In this regard, it should be observed that the definition of special damages given in Instruction 21 was limited to direct economic losses and out of pocket expenses. The purpose of that instruction was to obtain a determination of that question as a finding of fact. The law does not so limit damages in defamation cases.

 Moreover, as a matter of policy there is no reason to require special damages in a business disparagement case. It is a carryover from the slander of title origins of this tort. Because this was a defamation of Big O in its trade or business by the implication that it was stealing from Goodyear, there would be no need to show special damages to recover under traditional tort concepts. On the facts of this case, the wrong done to Big O is properly characterized as a defamation of the reputation of the corporation. If special damages must be shown for disparagement of property such a requirement should not apply to cases where, as here, the injury is the equivalent of common law character defamation.

The defendant claims that there was no evidence of malice to support the claim of trademark disparagement. The jury was instructed that malice was an essential element of that claim. The definition of malice given in Instruction 19 was acting with intent to vex, injure or annoy. Whether Goodyear's conduct met that standard was a question of fact within the province of the jury. Because the evidence which has been reviewed in the detailed findings of fact herein would support the inference of such an intent, the verdict may not be disturbed.

The defendant insists that there can be no award of damages for trademark infringement without a showing that Goodyear intended to trade on the goodwill of Big O or to palm off Goodyear products as being those of Big O. Goodyear also argues that reverse confusion is not actionable.

■ These contentions ignore the history of the development of the law of trademarks and unfair competition. The early aim of this law was the prevention of fraud through palming off one's goods as being those of another. Vandenburg, *Trademark Law and Procedure,* 2nd edition, § 5.20 p. 136 (1968). It is now recognized that such deception is only one type of unfair competition and that there may be liability for other kinds of abuse of a trademark. McCarthy, *Trademarks and Unfair Competition,* Vol. 1 § 5:2, p. 114 (1973).

The instructions given in this case recognized that passing off is but a part of the general law of unfair competition. The jury was asked to decide separately the theories of liability. The false designation of origin instruction (No. 14) presented the issue of passing off. It was rejected. The trademark infringement instruction asked the jury whether Goodyear had been guilty of another form of unfair competition in its use of BIGFOOT as a trademark for tires.

■ Goodyear's argument that the law of unfair competition does not protect against reverse confusion would return us to the 19th century view that only passing off is actionable. The logical consequence of accepting Goodyear's position would be the immunization from unfair competition liability of a company with a well established trade name and with the economic power to advertise extensively for a product name taken from a competitor. If the law is to limit recovery to passing off, anyone with adequate size and resources can adopt any trademark and develop a new meaning for that trademark as identification of the second user's products. The activities of Goodyear in this case are unquestionably unfair competition through an improper use of a trademark and that must be actionable. *Cf. W. E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656 (2nd Cir. 1970).

To the extent the Seventh Circuit's decision in *Westward Coach Mfg. Co., Inc. v. Ford Motor Co.,* 388 F.2d 627 (7th Cir. 1968) is inconsistent with my analysis, I must respectfully disagree with it. The facts of the Big O case demonstrate the flaws in the adoption of a simplistic rule that reverse confusion is not actionable.

Unfair competition has often been described as competitive activity contrary to contemporary society's concepts of fair play. Fairness must be considered in the context of the public policies which the law of unfair competition seeks to advance and support. Instruction 1 identified those policies as " . . . the need to protect the public from being misled as to the nature and source of the products they buy," " . . . a need to protect the property rights of a business to identify itself and its products to the public," and " . . . a need to try to achieve these goals without injury to the competition among products and businesses which is the vital element of a free economic system." The jury was also advised that because these policies conflict, "cases of this type are to be decided largely on their specific facts . . .."

The defendant argues that protection of the public from confusion and protection of the right of a business to identify itself as a source of the products it markets would not be affected where there was no intent to deceive. That argument is best answered by the comments of Justice Holmes in his concurring opinion in *International News Service v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). In that case the unfair competition was the defendant's appropriation and transmission of the plaintiff's news information as a commercial product to its clients. Justice Holmes observed:

> The ordinary case . . . is palming off the defendant's product as the plaintiff's, but the same evil may follow from the opposite falsehood—from saying, whether in words or by implication that the plaintiff's product is the defendant's, and that, it seems to me is what has happened here . . .. The falsehood is a little more subtle, the injury a little more indirect, than in ordinary cases of un-

fair trade, but I think that the principle which condemns the one condemns the other.

248 U.S. 215, 246–247, 39 S.Ct. 68, 75.

■ Goodyear's assertion that injunctive relief is the only available remedy in the absence of palming off or an intent to deceive must also be rejected. Where there is an intent to deceive, the importance of awarding damages to deter such conduct is obvious. Such deterrence is equally important in this case. If the only protection available to Big O were to be an injunction against future use, the degree of protection would be in direct proportion to the complexity of the case and the condition of the court's calendar. One in the position of Goodyear might very well obtain all of the benefit it wanted from an infringing use of a trademark before the case could be heard. Moreover, a limitation of relief to an equitable remedy would deprive the plaintiff of a right to a trial by jury, and the judgment of contemporary standards of fair competition can best be made by a jury.

Goodyear also contends that the punitive damages are excessive. When he was a judge of this court, Judge Doyle made a comprehensive and cogent analysis of the Colorado law of exemplary damages in *Wegner v. Rodeo Cowboys Association,* 290 F.Supp. 369 (D.Colo. 1968). That was an action for defamation affecting the plaintiff's trade or business in which the jury returned a verdict of $5,000. actual damages and $20,000. exemplary damages. Judge Doyle concluded that Colorado had no fixed ratio between actual and exemplary damages and that the question to be considered is whether there is such a disproportion as to warrant an inference that the jury verdict resulted from passion or prejudice.

This decision was affirmed in *Wegner v. Rodeo Cowboys Association,* 417 F.2d 881 (10th Cir. 1969). On the issue of exemplary damages, Judge Seth said at page 884:

. . . The exemplary and actual damage relationship in defamation cases is not comparable to that present in most tort cases as the trial court pointed out. The actual damages in libel actions are so dependent upon factors peculiar to the plaintiff's situation in the community, and are thus unlike physical damages although they are presumably compensatory also. This aspect of the damages evaluation together with the malice and the punitive aspects of exemplary damages which often are more obvious in defamation cases thus lead to a somewhat different consideration of the exemplary-compensatory ratio in such cases

. . .

As in *Wegner, supra,* the Goodyear behavior was not impulsive, and here, as there, I can see no reason to scrutinize the proportions. A review of the cases cited by Judge Doyle reveals many ratios in defamation cases greatly in excess of the proportions in this verdict.

■ The entire purpose of punitive damages is punishment for wrongful conduct and the amount awarded should be adequate to call the defendant's attention to that wrongful conduct. The amount of $16,800,000. is not a disproportionate burden to the world's largest tire company, a company which could afford to spend $10,000,000. in one year promoting a single model of tire.

■ The contentions made in the motion for new trial with respect to evidence of offers to compromise were presented at the time of the introduction of that evidence during the course of the trial. The questioned evidence has been set out in the findings of fact. The ruling was that these communications between Big O and Goodyear representatives before this civil action began were not offers to compromise a dispute; they were simply business communications and they were relevant and material to show knowledge, willful infringement and misconduct by Goodyear. I adhere to that ruling.

■ The motion for a new trial also renews an objection to the admission of evidence of the amount of advertising expenditures made by the defendant.

Such evidence was properly received as relevant and material to a number of issues, including the magnitude of the effort made by the defendant to adopt, use and absorb the plaintiff's trademark.

Upon the foregoing, it is

Ordered that the defendant's motion for a new trial and motion for judgment notwithstanding the verdict are denied.

### PLAINTIFF'S MOTION TO FILE A SECOND AMENDED COMPLAINT

■■■■ After the jury returned the verdict, Big O filed a motion under F.R. C.P. 15 for leave to file a second amended complaint, tendering an amended complaint with that motion. This new pleading is not necessary. The theory of liability based on trademark disparagement was not explicitly set out in the original complaint or in the amended complaint filed in December, 1974. It was, however, clearly within the subject matter of those pleadings and the defendant was not disadvantaged in any way by the pleadings. The characterization of conduct in terms of legal theory does not require amendment of the pleadings. At any rate, under Rule 15(b) the failure to amend does not affect the result of the trial of the issues. It is, therefore,

Ordered, that the plaintiff's motion to file a second amended complaint is denied.

### PLAINTIFF'S MOTION TO AWARD ATTORNEYS' FEES

■■■ The plaintiff has moved for an award of attorneys' fees as a part of the recovery and, alternatively, for a partial award of attorneys' fees as a sanction under Rule 37. The jury rejected the plaintiff's claim for false designation of origin under the Lanham Act. Accordingly, there is no statutory basis for the allowance of attorneys' fees in this case. It is clear that in cases within the federal question jurisdiction of federal courts, the American Rule prevails and there can be no allowance of attorneys' fees in the absence of statute or agreement.

*Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Neither is there any basis for such a recovery under Colorado law. *Beebe v. Pierce,* 521 P.2d 1263 (1974). While the *Alyeska* opinion notes that certain equitable considerations may create modifications of this rule, the facts of this case do not come within those recognized exceptions.

■■■ The claim for a sanction under Rule 37 is not well founded. While I have made findings and conclusions that the affirmative defense of extension was not proven at the trial, I cannot agree that the defendant's counsel acted improperly in asserting it as a defense or in the use of alternative and inconsistent theories of defense. Accordingly, it is

Ordered, that the plaintiff's motion for an award of attorneys' fees is denied.

### PLAINTIFF'S MOTION FOR INTEREST

■■■ The plaintiff has made various claims for interest as additional damages from the date of infringement and on the amount of the jury verdict from the date of its return. Under 28 U.S.C. § 1961, the question of interest is governed by state law. The applicable statute is 1973 C.R.S. § 5–12–102, as amended by House Bill No. 1087. That legislation provides for interest at the rate of 8% per annum on any judgment from the date of entry of judgment. In this case a judgment was entered for $19,-600,000. on October 4, 1975. Interest is running on that judgment at a rate of 8% per annum from October 6, 1975. It is, therefore,

Ordered, that the plaintiff's motion for an allowance of interest is denied.

### DEFENDANT'S COUNTERCLAIM

In its answer filed on December 13, 1974, Goodyear made a counterclaim for injunctive relief against the plaintiff. The answer and counterclaim were amended as a result of a hearing on June 6, 1975. Because the counterclaim sought only injunctive relief, it was not presented to the jury for decision.

In its pleadings, Goodyear took the position that it had an exclusive right to the use of BIGFOOT as a trademark for automobile tires as the result of an expansion from Goodyear's use of that name on snowmobile track as a related product. The jury verdict destroyed that position. In a post verdict motion, Goodyear now seeks to enjoin Big O from any use of BIG FOOT as a trademark for automobile tires in all states other than the 14 states in which Big O BIG FOOT tires were sold or offered for sale to the consuming public before September 16, 1974. That position is based upon the contention that Goodyear is the first user in these other states.

■ It has long been the law that the prior appropriation of a trademark in one geographical market does not entitle the first user to prevent a second user from using the same trademark in a separate and geographically remote area if the second user selected its mark in good faith. *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916); *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918). A recent application of this doctrine in this circuit is *Value House v. Phillips Mercantile Co.,* 523 F.2d 424 (10th Cir. 1975).

■ Clearly a second user is not in good faith if he selected the mark with an intent to misappropriate and benefit from the prior user's goodwill or to prevent the extension of his trade. It is also true that mere knowledge of the existence of the first user in his trademark does not destroy good faith. McCarthy, *Trademarks and Unfair Competition,* Vol. 2, § 26:3 (1973).

■ The defendant contends that it acted in good faith. When the Goodyear officials made the decision to prepare the BIGFOOT multi-media nationwide advertising campaign on July 10, 1974, they were not aware of the Big O BIG FOOT tires. They did become aware on August 24, 1974. Goodyear made its first actual use of BIGFOOT as a trademark for tires on September 16, 1974. At that time the Goodyear officials had complete information about Big O's use of BIG FOOT and they made a calculated and deliberate decision to go forward with the Goodyear use without regard for the consequences to Big O. That is not good faith. Under the circumstances of this case, I am unable to accept the argument that there is good faith if there is no intent to obtain a free ride on the plaintiff's goodwill.

I also believe that the facts of this case do not fit within the principles of the cases which recognize separate geographical markets. Before September 16, 1974, the Big O BIG FOOT tires were sold or offered for sale in Big O dealers' stores in the states of Oregon, Washington, California, Idaho, Utah, Nevada, Arizona, Colorado, New Mexico, Kentucky, North Carolina and South Carolina. After September 16 and during the time of concurrent use, new dealers in Illinois, Michigan and Virginia handled the Big O BIG FOOT tires. While most of the Big O dealers were on the West Coast and in the Rocky Mountain Area states, the existence of stores in the Carolinas and Kentucky together with the expansion into Illinois, Michigan and Virginia reflect that the Big O organization is not merely regional in character and that the plaintiff is engaging in continuing efforts to extend its geographical market.

Moreover, it must be recognized that the advertising and marketing of automobile tires in 1974 are activities which are much different in character from the sale of flour in 1903, forming the basis for the *Hanover* case, *supra,* and the sale of drugs in 1912, forming the basis for the *Rectanus* decision, *supra.* One obvious difference is that automobile tires are placed on automobiles which move throughout the United States. Another difference is that automotive tire dealers belong to trade organizations which have national conventions and distribute trade and product information throughout the country.

The most fundamental difference, of course, is multi-media advertising on a national scale. As I previously observed,

Goodyear attracted the attention of a huge national audience and obtained both recognition and identification of its radial tire with the term BIGFOOT in a few hours on the evening of September 16, 1974. The advertising in national magazines and in newspapers throughout the country appeared immediately after that telecast. The saturation was persistent, consistent and complete. Goodyear made no effort to avoid sending its message into the area already occupied by Big O's product. Big O was simply overrun and overwhelmed. That can hardly be considered to give Goodyear an exclusive right to this trademark anywhere.

The defendant argues that while it admittedly did have prior knowledge of Big O's BIG FOOT tires, Goodyear had a reasonable and good faith belief that Big O did not have an exclusive trademark. I cannot accept the view that doubt about the legal position of a prior user can be a standard for good faith. Even if that were the law, the only factual basis for a reasonable doubt about Big O's BIG FOOT is the prior use of BIGFOOT by Goodyear on snow-mobile tracks. That was a slender reed. In my view, there was no reasonable belief that Goodyear would not be infringing Big O's trademark in the 14 states having Big O dealers on or before September 16, 1974.

Upon the foregoing it is concluded that the Goodyear counterclaim should be dismissed and judgment entered for the plaintiff on the counterclaim. It is, therefore,

Ordered, that the counterclaim of Goodyear is dismissed and judgment be entered for the plaintiff on that counterclaim.

## PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

On September 4, 1975, after the jury verdict was received, this court entered an order enjoining Goodyear from any use of BIGFOOT (BIG FOOT) in any television advertising of automobile tires as of 1:00 P.M., Mountain Daylight Time, on Monday, September 8, 1975. The plaintiff has now requested that Goodyear be enjoined from any use of BIGFOOT (BIG FOOT) on or in connection with vehicle tires throughout the United States. The issue presented by that motion is identical with the question raised by the defendant's counterclaim. Does Goodyear as a second user have the right of a first user in the states in which there were no Big O tire dealers before September 16, 1974? For the reasons discussed in the dismissal of the defendant's counterclaim, Goodyear has no such right and the plaintiff is entitled to a full injunction for the protection of its exclusive right to the use of BIG FOOT as a trademark for automobile tires throughout the United States.

Accordingly, it is hereby

Ordered, adjudged and decreed:

1. That effective ten (10) days from the date hereof, defendant, The Goodyear Tire & Rubber Company, its agents, officers, servants, employees, attorneys, and all persons in active concert with them who receive actual notice of this order by personal service or otherwise, are hereby ·forever enjoined and restrained from using in any newspaper or magazine tire advertisements in promoting the sale, offering for sale, distribution or advertising of vehicle tires or similar merchandise the name or term BIGFOOT (BIG FOOT), or any designation which is confusingly similar thereto at any locality in the United States.

2. That effective thirty (30) days from the date hereof, defendant, The Goodyear Tire & Rubber Company, its agents, officers, servants, employees, attorneys, and all persons in active concert with them who receive actual notice of this order by personal service or otherwise, be and are hereby forever enjoined and restrained from using in any point of sale displays, brochures, banners or the like used in any connection with vehicle tires and the sale thereof the name or term BIGFOOT (BIG FOOT), or any designation which is confusingly similar thereto at any locality in the United States.

3. That within thirty (30) days from the effective date hereof, defendant, The Goodyear Tire & Rubber Company, its agents, officers, servants, employees, attorneys, and all persons in active concert with them who receive actual notice of this order by personal service or otherwise, be and are hereby forever enjoined and restrained from all other use in any connection with vehicle tires in promoting the sale, offering for sale, distribution or advertising of vehicle tires or similar merchandise the name or term BIGFOOT (BIG FOOT), or any designation which is confusingly similar thereto at any locality in the United States.

4. This order is not applicable to existing telephone directories which contain the name or term BIGFOOT (BIG FOOT) in any connection with vehicle tires.

### PLAINTIFF'S MOTION FOR ACCOUNTING FOR PROFITS AND GAINS

In addition to the jury's award of compensatory and punitive damages, the plaintiff seeks the equitable relief of an accounting for and payment over of all profits earned and obtained by the defendant from Goodyear's use of the trademark BIGFOOT in connection with the sale of its automobile tires. There are three well recognized purposes for the use of the remedy of an award of profits.

Perhaps the most common application of this equitable remedy is compensation for injury when the damage remedy at law is inadequate. Where the defendant has been guilty of deliberately engaging in unfair competition by trademark infringement, or otherwise, for the purpose of gaining sales through confusion or palming off his products as those of the plaintiff, an accounting for the profits from such wrongful conduct is an appropriate way of measuring the plaintiff's damage. Frequently in such cases the plaintiff is unable to show that he has lost sales and because the defendant's gains are the only measurable evidence of the plaintiff's loss, an accounting is ordered to make the plaintiff whole. McCarthy, *supra,* § 30:25(b), pp. 351–2.

The second basis for such an order is the familiar concept of unjust enrichment. Again, this is most appropriate where the plaintiff is unable to show direct losses. *Blue Bell Co. v. Frontier Refining Co.*, 213 F.2d 354 (10th Cir. 1954). The recovery of gains realized from the conversion of property is a familiar concept in equity. A trademark is a property right and the traditional and customary method of infringement by palming off the products of the second user is a form of conversion of that property.

These concepts are not applicable in this case. There is no palming off and while there is no evidence of any lost sales by Big O, this court has recognized a right to recover damages for the cost of removing the confusion by equivalent advertising. That damage remedy is adequate to make the plaintiff whole. In my view, the amount awarded by the jury as compensatory damages and the injunction now ordered give Big O complete compensation for past injury and adequate protection against future damage.

The third recognized ground for an accounting of profits is the deterrence of willful infringement and the protection of the public. *Monsanto Chemical Co. v. Perfect Fit Products Mfg. Co.*, 349 F.2d 389 (2nd Cir. 1965). That is also the policy justification for the award of punitive damages. In this case, the jury made a very substantial award of punitive damages and, in my opinion, that amount is an adequate punishment of Goodyear for its wrongful conduct in this case. The amount of this verdict should certainly serve as an example to deter others from similar misconduct.

Therefore, it is my conclusion that an accounting for profits as an equitable remedy would result in an overcompensation to the plaintiff.

Big O in its motion for an accounting has alleged certain facts to suggest a violation of the injunction ordered in this case on September 8, 1975 and to suggest that the defendant has made new infringing uses of the BIGFOOT trademark. Additionally, Big O has recently filed motions to seek a contempt citation for alleged violations of that injunction. It is more appropriate to consider those allegations at a hearing on the question of contempt than to include them in the motion for an accounting for lost profits. Accordingly, the conclusion that no accounting will be ordered should not be considered to be a determination of these questions of misconduct after the jury trial of this case. It is, therefore,

Ordered, that the plaintiff's motion for an accounting for profits and gains is denied.

## MOTION TO VACATE ORDER STAYING EXECUTION OF JUDGMENT

The final matter to be considered now is the plaintiff's motion to vacate an order entered on October 14, 1975 granting a stay of execution of judgment pending disposition of the post trial motions. That matter is now moot. All post trial motions which relate to the judgment are determined herein. The only motions not yet considered are the recently filed motions seeking a citation for contempt. These relate to allegations of misconduct since the entry of judgment and an evidentiary hearing will be required to determine the issues. The judgment will not be affected by it and the pendency of that motion has no effect on the time for appeal. Accordingly, it is

Ordered that the subject motion is denied.

## APPENDIX I

### UNFAIR COMPETITION

#### No. 1

In this case, the plaintiff, Big O Tire Dealers, Inc. seeks to recover money damages from the defendant, The Goodyear Tire and Rubber Company for what the plaintiff claims to be unfair competition in the use of the term BIGFOOT in connection with automobile tires. The applicable legal principles to be discussed in these instructions on the law of unfair competition have evolved from attempts to achieve three different policy objectives which are in conflict.

First, there is the need to protect the public from being misled as to the nature and source of the products they buy.

Second, there is a need to protect the property rights of a business to identify itself and its products to the public.

Third, there is a need to try to achieve these goals without injury to the competition among products and businesses which is the vital element of a free market economic system.

It is this third goal of free competition which conflicts with the second and, to some extent, the first.

Because of these policy conflicts, cases of this type are to be decided largely on their specific facts and you, the jury, are the judges of the facts.

### THREE THEORIES OF LIABILITY

#### No. 2

There are three different forms of unfair competition which must be considered by the jury in this case. For our purposes here, they can be called trademark infringement, false designation of origin and trademark disparagement. These are three theories of liability and I will instruct you as to each of them as well as the affirmative defenses to them.

If you find liability under one or more of these doctrines, then you will consider the question of damages and these instructions will include what can be considered as damages under these three theories of liability.

### TRADEMARK

#### No. 3

The term "trademark" includes any word, name, symbol or device, or any combination thereof, adopted and used

by a manufacturer or merchant to identify his goods and to distinguish them from those manufactured or sold by others.

The function of a trademark is to designate goods as a product of a particular manufacturer or merchant and to protect his goodwill against the sale of another's product as his.

A trademark is also a merchandising shortcut which induces a prospective purchaser to select what he wants or what he has been led to believe he wants. There is, therefore, a public interest in avoiding confusion in the use of trademarks.

One product can bear more than one protectable trademark.

## MERCHANT

### No. 4

An owner of a trademark need not be the manufacturer of the goods with which the trademark is used. So a merchant may own a trademark to identify the products he sells even though such products are made by someone else.

## WORDS

### No. 5

In trademark usage, words can be classified according to the degree of their distinctiveness. A *coined* word is an artificial word which has no language meaning except as a trademark.

EXXON is a coined word used by an oil company.

A *fanciful* word is like a coined word in that it is invented for the sole purpose of functioning as a trademark and it differs from the coined word only in that it may bear a relationship to another word or it may be an obsolete word.

FAB is a shortened version for fabulous and is a fanciful word used for detergent.

An *arbitrary* word is one which is in common linguistic use but when used with the goods in issue it neither suggests nor describes any ingredient, quality or characteristic of those goods.

OLD CROW for whiskey is an example of an arbitrary word.

A *suggestive* word is one which suggests what the product is without actually being descriptive of it.

STRONGHOLD for threaded nails is suggestive of their superior holding power.

A merely *descriptive* word is one which draws attention to the ingredients, quality or nature of the product.

TENDER VITTLES as applied to cat food is descriptive.

A *generic* word is one which is the language name for the product.

BUTTER is the language word for butter. There can be no trademark rights in a generic term. They remain in the public domain as a part of our language.

The right to protection of a trademark comes from its use to identify the product.

We speak of strong and weak marks in terms of the amount of use necessary to create protected rights. Words which are coined, fanciful or arbitrary are distinctive almost from their first use. Suggestive words are also protected as trademarks when used distinctively for particular products.

Words which are merely descriptive do not obtain protection solely from their use as a trademark. Such words must first acquire distinctiveness from the effect of the owner's efforts in the marketplace. This is what is called the development of secondary meaning; that is a merely descriptive term used as a trademark must have been so used that its primary significance in the minds of the consuming public is not the product itself but the identification of it with a single source.

## EXCLUSIVE

### No. 6

When a manufacturer or merchant has established a trademark right by use on

or in connection with a product before anyone else, the right to use it becomes an exclusive right and the trademark is his property. No other person can use the same or similar words in any manner which would be likely to cause confusion.

### AFFIRMATIVE DEFENSE

### DESCRIPTIVE—SECONDARY MEANING

#### No. 7

In this case, Big O Tire Dealers, Inc. claims that by September 16, 1974, it had established the term BIG FOOT as a trademark for two types of automobile tires sold by it: the Big O BIG FOOT 60 and the Big O BIG FOOT 70 tires.

To this claim the defendant Goodyear has raised the affirmative defense that the term BIG FOOT is merely descriptive of a quality or characteristic of these Big O tires and it is not distinctive.

This is the first question for the jury to answer. Is the term BIG FOOT merely descriptive of a quality or characteristic of the Big O BIG FOOT 60 and Big O BIG FOOT 70 tires?

If your answer to that question is no; then you will consider whether the evidence shows that Big O Tire Dealers, Inc. used BIG FOOT as a trademark for these particular products before September 16, 1974; that is, whether the plaintiff used BIG FOOT to identify Big O Tire Dealers, Inc. to the consuming public as the source of these two tires.

On the other hand, if you decide that BIG FOOT is merely descriptive as applied to these Big O tires, then you will consider whether the evidence shows that before September 16, 1974, the plaintiff had so used BIG FOOT as to develop a secondary meaning such as to associate that term with Big O Tire Dealers, Inc. in the minds of a significant number of the consuming public.

A word or phrase which is merely descriptive can still become a trademark if such a secondary meaning has been developed for it by usage in the market-place. It is not necessary for the plaintiff to prove that all or even a majority of the consuming public understand this secondary meaning. What must be shown by the evidence is that a significant number of the consuming public must have associated BIG FOOT with the plaintiff before September 16, 1974. It is for the jury to decide how many constitute a significant number.

### TRADEMARK INFRINGEMENT

#### No. 8

If you decide that the plaintiff had established BIG FOOT as a trademark for its tires by September 16, 1974, then you must consider whether the defendant infringed that trademark by its use of BIGFOOT in connection with its advertising and sale of the Goodyear custom polysteel radial tire, beginning on September 16, 1974.

A trademark is infringed when a second person (later user) uses it in a manner which is likely to cause confusion among ordinarily prudent purchasers or prospective purchasers as to the source of the products. The test is not one of actual confusion; it is the likelihood of confusion.

### ELEMENTS OF INFRINGEMENT

#### No. 9

To find liability for trademark infringement, the jury must find from a preponderance of the evidence that:

1. Big O Tire Dealers, Inc. had established BIG FOOT as a trademark for its tires before September 16, 1974; and

2. That Goodyear in its advertising and sales program beginning with a nationwide telecast on September 16, 1974, used BIGFOOT in a manner likely to cause confusion among persons using ordinary care and prudence in the purchase of tires.

### CONCURRENT USE

#### No. 10

It is legally possible to have two companies using the same term for compet-

ing products, concurrently, without any liability to each other.

In this case, if you should find that BIG FOOT is merely descriptive as applied to these automobile tires and that Big O Tire Dealers, Inc. had not established a secondary meaning to make that word distinctive for its tires before Goodyear began using BIGFOOT in connection with Goodyear tires, then both Big O Tire Dealers, Inc. and Goodyear have the right to its use for their respective tires and there is no trademark infringement.

If there is a concurrent right to the use of BIG FOOT by both parties, then the fact that the defendant's greater economic power makes it possible for Goodyear to make a much more effective use of BIGFOOT than that which can be accomplished by the plaintiff does not create any liability to the plaintiff. Stated a different way, the difference in strength between competitors in the marketplace is not, in itself, unfair competition under the law.

### EXTENSION
#### No. 11

The defendant has raised an additional affirmative defense to this claim of trademark infringement under what is called the doctrine of extension or expansion to related products. Under that doctrine the owner of a well established and distinctive trademark for one product may extend that trademark to a use on a different but related product if the use of that mark by someone else on the related product would be likely to cause confusion. A merchant or manufacturer who claims the right of expansion must also show a purpose or propensity to extend its use of the mark to the related product before its use by others on such products.

In this case, Goodyear has introduced evidence of its use of the term BIG-FOOT on replacement track for snowmobiles before the plaintiff's use in connection with automobile tires.

To determine whether Goodyear has proven this affirmative defense of a right of expansion you must answer two questions:

First, did Goodyear have a valid trademark for snowmobile track belts?

Second, at the time Big O Tire Dealers, Inc. first used BIG FOOT on automobile tires, would an ordinary consumer expect that the source of a BIG FOOT automobile tire would be the same as the source of a BIG-FOOT snowmobile track belt?

In answering the second question, you should consider:

1. The strength of the trademark in terms of its distinctiveness.

2. Whether automobile tires and snowmobile track belts are sold through the same channels of trade distribution.

3. Whether automobile tires and snowmobile track belts are advertised, promoted and marketed in the same manner.

4. Whether automobile tires and tracks for snowmobiles are sufficiently related that a company which makes and sells one would be likely to make and sell the other.

Any other factor which your common experience tells you is relevant to determine that there would or would not be a likelihood of confusion of the source of these products.

### TOKEN USE
#### No. 11(a)

To find that Goodyear had a valid trademark for snowmobile track belt you must find that their use of BIGFOOT for track belt was not a token use. Token use is sporadic, casual, or transitory use not part of an ongoing program to commercially exploit the trademark. The number of sales is not conclusive, but there must be a bona fide attempt to establish a trade or a market in the trademarked product.

## ABANDONMENT

### No. 12

To find that Goodyear had the right of expansion from its use of BIGFOOT on snowmobile track to a trademark use of BIGFOOT for automobile tires, you must consider abandonment. The owner of a trademark may be considered to have abandoned his right to exclusive use of that trademark if he discontinues its use with an intent not to resume it.

## REGISTRATION

### No. 13

During the course of this trial there have been several witnesses who have mentioned applications for registration of trademarks with the United States Patent Office. There is in evidence exhibit 2437 which is a document showing that BIGFOOT was registered as a Goodyear trademark for snowmobile track on October 15, 1974.

The legal effect of such registration is to create a presumption that the company owning the registration established a valid trademark for a product at the time of its first use with the product and that it has been and is in continuous use with that product. The date of first use of BIGFOOT by Goodyear for snowmobile track is shown on exhibit 2437 as October 22, 1973 and Goodyear filed the application for that registration on December 12, 1973.

So, from this exhibit, it is presumed that Goodyear established BIGFOOT as a trademark for snowmobile track on October 22, 1973 and that it has continuously used this trademark for snowmobile track since that time and has the exclusive right to do so.

This presumption can be rebutted by the evidence to the contrary and the jury is free to find that a registered trademark is not a valid trademark. Thus, from the evidence presented to you at this trial, you could find that Goodyear did not have a valid trademark for BIGFOOT for snowmobile track before Big O Tire Dealers, Inc. used BIG FOOT for tires.

You will remember from the previous instructions that the date when a valid trademark is established depends on the strength of the mark in terms of distinctiveness. For example, if you determine that BIGFOOT is descriptive of the qualities or characteristics of snowmobile belt track you must also determine if that mark ever acquired a secondary meaning in the mind of the consuming public. If BIGFOOT for snowmobile belt track is merely descriptive and it did not acquire a secondary meaning, then Goodyear could not have a valid trademark for BIGFOOT for snowmobile belt track. If BIGFOOT is descriptive but has acquired a secondary meaning, then the date that it became a protected trademark would be the date that such secondary meaning attached, regardless of the date of first use or the date of registration.

If BIGFOOT is not merely descriptive of qualities or characteristics of snowmobile track belt but a suggestive word for snowmobile track belt, then it became a protected trademark from the time BIGFOOT was first used distinctively in connection with snowmobile track belt to signify the origin of the product even though it was not registered until a later time. If BIGFOOT is a coined, fanciful or arbitrary word, then it became a protected trademark almost from the time BIGFOOT was first used in connection with snowmobile track belt to signify the origin of the product even though it was not registered until a later time.

I will tell you now that there have been proceedings in the Patent Office involving BIG FOOT (BIGFOOT) for tires. Because I think it would confuse and complicate this trial and because there have been no final decisions in the Patent Office I have excluded from evidence all information about the patent office proceedings.

## SECTION 43(a)

### No. 14

The plaintiff's claim for recovery on the theory of a false designation of origin is based on a section of a Federal statute known as the Lanham Act. Section 43(a) of that Act [15 U.S.C. § 1125(a)] provides that any person who shall use a false designation of origin in connection with any goods or any container for goods shall be liable to any person who is or may be damaged by such false representation. That is what is commonly called "passing off".

To establish its claim against Goodyear on this theory of liability, the plaintiff must prove by a preponderance of the evidence each of the following elements:

1. That the plaintiff's use of BIG FOOT on or in connection with the Big O BIG FOOT 60 and Big O BIG FOOT 70 tires has established the term BIG FOOT as an indication of the source or origin of these tires.

2. That Goodyear's use of BIGFOOT in connection with automobile tires constituted a false representation with respect to the origin of the tires sold by Goodyear.

3. That there is a likelihood of confusion among ordinarily prudent purchasers as to whether Goodyear tires came from some other source.

## LIKELIHOOD OF CONFUSION

### No. 15

In determining whether there is or will be a likelihood of confusion caused by the use of BIGFOOT (BIG FOOT) by both plaintiff and defendant in connection with automobile tires you may draw on your common experience as citizens of the community. In addition to the general knowledge you have acquired throughout your lifetimes, you may also consider:

(1) The degree of similarity between the marks in question.

(2) The intent of Goodyear in adopting the mark, that is whether there was an intent to confuse.

(3) The manner and method in which Big O Tire Dealers, Inc. and Goodyear used BIG FOOT (BIGFOOT).

(4) The similarity between the products in question, plaintiff's tires and the tires made by defendant.

(5) The degree of care likely to be used by purchasers.

(6) Other factors about the product which would tend to reduce any tendency to confuse the purchaser as to the source or origin of the product.

In light of these considerations and your common experience, you must determine if ordinary consumers, neither overly careful nor overly careless, would be confused as to the origin of the tires, upon encountering the mark BIGFOOT as the respective parties have used it in connection with tires.

No one factor or consideration is conclusive, but each aspect should be weighed in light of the total evidence presented at the trial.

## DISPARAGEMENT

### No. 16

The third theory of liability to be considered in this case is called trademark disparagement.

This is a doctrine which is somewhat like injury to a person's reputation through defamation. It is a civil wrong to publish false statements about a company's property rights if the result is economic injury. In this case the property right involved is ownership of BIG FOOT as a trademark for automobile tires.

If you find that on September 16, 1974, Big O Tire Dealers, Inc. had established BIG FOOT as a trademark for its exclusive use on automobile tires, then you must consider whether Goodyear disparaged that trademark by its actions.

If the plaintiff did not have an established trademark then there could be no disparagement of it.

## ELEMENTS OF DISPARAGEMENT

### No. 17

To establish a claim for trademark disparagement, the plaintiff must show by the preponderance of the evidence:

1. That the defendant published some false statement or statements to the plaintiff's customers or potential customers which could reasonably be understood to cast doubt or confusion about the validity of plaintiff's trademark.

2. That the defendant acted with malice.

3. That such false statements had an adverse economic effect upon the plaintiff's business.

## PUBLISH

### No. 18

Words are published when they are communicated or circulated in any manner to any person other than the officers of the plaintiff. The publications involved here are those which Goodyear did or caused to be done in advertising its tire with the use of the term BIGFOOT. That includes television advertising.

## MALICE

### No. 19

To act with malice means to act with the intent to vex, injure or annoy.

## PLAIN MEANING

### No. 20

In determining whether the defendant's advertising campaign, using the word BIGFOOT, could reasonably be understood to cast doubt upon the plaintiff's right to the use of BIG FOOT as a trademark for its tires, you should consider the plain and natural meaning of the words used in the plain and popular sense in which the consuming public would understand them. You should also consider the words used in their complete context and not dwell upon isolated parts of phrases. Thus, you must interpret the words used in connection with and as a related part of the complete communication and give them such meaning as would naturally be given by persons of ordinary understanding and intelligence.

## DAMAGES—TYPES

### No. 21

I am turning now to the question of damages and what can be considered in determining an award of money in this case. By including damages in these instructions, I do not wish to be understood to be suggesting or implying anything with respect to the issue of liability or as to whether or not any damages have been proven in this case.

There are three kinds of damages which can be considered in a civil case. These are special compensatory damages, general compensatory damages, and punitive damages.

Special compensatory damages are direct economic losses and out of pocket expenses resulting from the effect of the defendant's conduct on the plaintiff.

General compensatory damages are measured by the amount necessary to make the plaintiff whole. What is the amount of money required to right any wrong done to the plaintiff by the defendant?

Difficulty or uncertainty in ascertaining or measuring the precise amount of any damages does not preclude recovery, and the jury should use its best judgment in determining the amount of such damages, if any, based upon the evidence.

In determining general compensatory damages, you may consider whether the plaintiff, Big O Tire Dealers, Inc., suffered any measurable loss to its goodwill.

The goodwill of a company is an intangible business value which reflects the basic human tendency to do business with a merchant who offers products of the type and quality which the customer desires and expects. Service to the customer and a willingness to stand behind

a warranty and other representations about the quality of the products which are sold by a merchant are all factors in the goodwill of that business.

The goodwill attached to a particular product or a business may be symbolized in whole or in part by the consuming public's acceptance and recognition of a trademark. The goodwill attached to a product is a part of the overall business value which is the goodwill of the company. It is possible, therefore, that the general goodwill of a corporation may be damaged by the loss of goodwill to a particular product. Whether this has occurred is a question of fact for you to determine.

If you find that the plaintiff's goodwill has been damaged either by injury to the goodwill associated with a particular product or injury to its general business reputation, you may assess such compensatory damages as you may find shown by the evidence. The measure of the plaintiff's damage is the difference between the value of such goodwill before and after the acts of the defendant.

The plaintiff has not sought to prove damage to its goodwill by showing lost sales, past or future, because of the acts of the defendant. Instead, plaintiff claims that it will be required to conduct an informational advertising campaign to repair the damage which it claims to have suffered; that is, to place Big O Tire Dealers, Inc. in whatever position with respect to the word BIG FOOT for tires that it may have enjoyed prior to September 16, 1974.

You are instructed, therefore, not to measure any damages by attempting to determine any lost past or future sales of the Big O BIG FOOT 60 and Big O BIG FOOT 70 automobiles tires. You are further instructed that any amount awarded as compensatory damages for any injury to the goodwill of the plaintiff must not exceed the amount of injury shown to have been caused to the plaintiff's good will by the evidence before you in this case. A jury may not determine damages by speculation or conjecture.

If you find that the plaintiff is entitled to a verdict in accordance with these instructions, but you do not find that the evidence before you is sufficient to show that the plaintiff has sustained any substantial actual damages, then you may return a verdict for the plaintiff on one or more of the theories of liability and fix the amount of the compensatory damages in a nominal sum such as $1.00. Such a verdict would determine the rights of the parties and the Court can then issue orders directing their future conduct.

The third type of damages is punitive damages. The award of a nominal sum for compensatory damages would not prevent your awarding punitive damages if you find that the award of punitive damages is justified under these instructions.

The purpose of awarding punitive or exemplary damages is to punish a wrongdoer for some extraordinary conduct and to serve as an example or warning to others not to engage in such conduct.

If you find in favor of the plaintiff on one or more of the theories of liability, then you should consider whether the plaintiff is entitled to exemplary damages. If you also find beyond a reasonable doubt that the injury complained of was attended by circumstances of fraud, malice, or a wanton and reckless disregard of the rights and feelings of the plaintiff, then, in addition to any actual damages, you may also award the plaintiff a reasonable sum as exemplary damages.

Reasonable doubt means a doubt based upon reason and common sense which arises from a fair and rational consideration of all the evidence or the lack of evidence in the case. It is a doubt which is not a vague, speculative or imaginary doubt, but such a doubt as would cause reasonable persons to hesitate to act in matters of importance to themselves.

Exemplary damages are not to be construed as compensation to the plaintiff for wrong done, but as punishment to the defendant and as an example to others.

Whether or not to make any award of punitive or exemplary damages, in addition to actual damages, is a matter exclusively within the province of the jury. The jury should bear in mind, not only the conditions under which, and the purposes for which, the law permits an award of punitive or exemplary damages to be made, but also the requirement of the law that the amount of such extraordinary damages, when awarded, must be fixed with calm discretion and sound reason, and must never either be awarded, or fixed in amount, because of any sympathy, or bias, or prejudice with respect to any party in this case.

### FORM OF VERDICT

### No. 22

The form of verdict prepared for your use asks for your findings with respect to each of the three theories of liability which constitute the plaintiff's claims in this case. These claims should be considered separately.

You understand, of course, that your verdict must be unanimous; that is that all of you must be in agreement and until you have such complete agreement, you do not have a verdict.

When you have decided the issues on the claim of trademark infringement, write in the name of the party in whose favor you find. So, if you find that the plaintiff has proven this claim, write in the name Big O in the space provided. If you find this claim has not been proven, write in the name Goodyear.

Follow the same procedure for the other two claims of liability for false designation of origin and for trademark disparagement.

Now on the question of damages, while there are three distinct claims for liability, there can be only one recovery for damages. So even if you find liability on more than one claim, you will determine damages as a single issue.

I have instructed you as to three different types of damages and the verdict form calls for your separate consideration of each type. If you find that no special compensatory damages have been proven, write in the word none in the space provided for an amount. If you find an amount has been proven, then write in the number in the space provided. You will follow the same procedure for the other types of damages.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 74–M–1106

BIG O TIRE DEALERS, INC.,

Plaintiff,

v.

VERDICT

THE GOODYEAR TIRE AND
RUBBER COMPANY,

Defendant.

We the jury in the above entitled cause, upon our oath do say that we find the following as our verdict herein:

Upon the claim of liability for trademark infringement we find for ___Big O Inc.___.

Upon the claim of liability for false designation of origin we find for ___Goodyear___.

Upon the claim for trademark disparagement we find for ___Big O Inc.___.

We find that plaintiff has proven special compensatory damages in the amount of $___None___.

We find that plaintiff has proven general compensatory damages in the amount of $___2,800,000___.

We assess punitive or exemplary damages in the amount of $___16,800,000___.

Dated: ___Sept. 4 1975___

___S/_____
Foreman