**PUMP, INC., Plaintiff,**

v.

**COLLINS MANAGEMENT, INC.; The David Geffen Company; Warner Brothers Records, Inc.; and Steven Tyler, Joe Perry, Brad Whitford, Tom Hamilton and Joey Kramer, d/b/a Aerosmith, Defendants.**

**Civ. A. No. 89–2536–Y.**

United States District Court,
D. Massachusetts.

March 9, 1990.

Jeffrey Baker and Andrew Leary, Baker & Nunes, Boston, Mass., for plaintiff.

David Rosenthal, Hutchins & Wheeler, Boston, Mass., and Richard Lehv, Weiss, Dawid, Fross, Zelnick & Leh, New York City, for defendants.

## MEMORANDUM OF OPINION

YOUNG, District Judge.

Rock music is doubtless among our society's most popular forms of entertainment as well as a universally accepted American export. It is thus one of the more significant tragedies of our time that rock music culture is so indelibly stamped in the public mind as inextricably intertwined with the use of illicit drugs.[1] In light of this sad popular perception, it would appear that a court would look favorably on the complaint of a virtually unknown musical group composed of muscular anti-drug crusaders who challenge a world-famous heavy metal rock-and-roll band.

Yet the law is no respecter of persons—even musical stylists—and courtroom proceedings are not morality plays. Consequently, in this service mark infringement case, the Court granted the defendants' motion for summary judgment in a ruling issued from the bench on January 3, 1990. This opinion sets out the Court's reasoning.

The plaintiff, Pump, Inc. ("Pump, Inc."), is the holder of a registered service mark for entertainment services in the nature of a musical group. The mark depicts a stylized version of the word "Pump" resting on what appears to be a barbell. *See* appendix "A." Pump, Inc.'s President and sole shareholder, Todd Ganci ("Ganci"), is a bodybuilder and former Mr. New England, as well as the band Pump's lead singer and songwriter. The alleged purpose of the band Pump is to promote physical self-improvement as an alternative to drugs, thereby providing a positive role model for today's youth.

Pump, Inc. has brought this action to prevent the rock group Aerosmith[2] from using its service mark "Pump" in connection with the sale, promotion and advertising of Aerosmith's latest album of the same name. *See* appendix "B." Named as defendants are Collins Management, Inc. ("Collins"), the David Geffen Company ("Geffen"), Warner Brothers Records, Inc. ("Warner Brothers"), and Steven Tyler ("Tyler"), Joe Perry ("Perry"), Brad Whitford ("Whitford"), Tom Hamilton ("Hamilton") and Joey Kramer ("Kramer"), the individual members of Aerosmith. The Court will refer to the defendants collectively as "Aerosmith."

The complaint alleges service-mark infringement in violation of the Lanham Act,

1. Even the most random perusal of the books and magazines available to me serve to establish this popular perception. *See, e.g.,* Kraft, *Sting: "I've Hurt a Great Many People,"* Women's World, Feb. 27, 1990, at 14; "Paul McCartney In Conversation," *The Paul McCartney World Tour* 36, 53–55 (1987); A. Solt & S. Egan, *Imagine: John Lennon* 135–35 (1988); B. Woodward, *Wired: The Short Life and Fast Times of John Belushi* passim, esp. 142–43 (1984); N. Schaffner, *The Beatles Forever* 74–75 (1977); J. Pascall, ed., *The Beatles* 66 (1975).

2. As most persons interested in rock music are aware, Aerosmith has developed a well-earned reputation as one of America's louder rock bands and has cultivated a devoted adolescent following since the early 1970s. Its hit songs include such classics as "Walk This Way," "Dream On," "Sweet Emotion," "My Big Ten Inch," and the poignant "Dude Look Like a Lady." The Court expresses no opinion as to the socially redeeming aspects of Aerosmith's work.

15 U.S.C. secs. 1114 and 1125(a) (1988); unauthorized use of a name in violation of Mass.Gen.L. ch. 214, sec. 3A (1986); deceptive trade practices in violation of Mass. Gen.L. ch. 93A, sec. 2(a) (1986); and common law unfair competition.[3] Pump, Inc. moved for a preliminary injunction when it filed the complaint. At oral argument on the motion on December 14, 1989, the Court reserved judgment and instead stated that it would entertain a motion for summary judgment. Aerosmith filed that motion on December 22. After hearing oral argument on January 3, 1990, the Court granted summary judgment in favor of Aerosmith. In light of the interesting nature of the legal issues involved, however, the Court reserved its right to issue a written opinion elaborating on its reasoning.

## I. The Standard for Summary Judgment

Generally, a party in a civil case is entitled to summary judgment if the party can show that (1) there is no genuine issue of material fact and (2) the party is entitled to judgment as matter of law. Fed.R.Civ.P. 56(c). Entry of summary judgment is also appropriate where a party, having had adequate time for discovery, still "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). When the defendant in a civil case moves for summary judgment, the test to be applied is "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In essence, the question is whether the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512.

The standard for summary judgment in a service mark infringement case[4] is well-settled in this circuit. Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as matter of law." *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989); *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 815 (1st Cir.1987); *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1204 (1st Cir.1983); *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 486 (1st Cir.1981). The First Circuit has further held that a factual dispute is "material" if it " 'affects the outcome of the litigation,' and genuine if manifested by 'substantial' evidence 'going beyond the allegations of the complaint.' " *Astra*, 718 F.2d at 1204 (quoting *Hahn v. Sargent*, 523 F.2d 461, 464 [1st Cir.1975], *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 [1976] ). In passing on a summary judgment motion, "the court must view the record and draw inferences in the light most favorable to the opposing party." *Volkswagenwerk*, 814 F.2d at 815; *Astra*, 718 F.2d at 1204; *Pignons*, 657 F.2d at 486; *Hahn*, 523 F.2d at 464.

Consequently, examining the evidence in a manner most favorable to Pump, Inc., this Court must determine if "a reasonable jury could return a verdict" for it. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. If not, Aerosmith is entitled to summary judgment. The Court notes in this context that "[w]hile infringement and unfair competition cases often present factual issues that render summary judgment inappropriate, this is not invariably so." *Kaz-*

---

**3.** Interestingly, the plaintiff does not plead violation of Mass.Gen.L. ch. 110B, sec. 11 (1986), the Massachusetts statute dealing with service mark infringement.

**4.** Service marks and trademarks are "similar yet distinct creatures." *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 23 n. 1 (1st Cir.1989). "A trademark is used to distinguish one's goods from those made by others, while a service mark is used to distinguish one's services from those offered by others." *Id.* For purposes of this motion, the distinction between the two is irrelevant; hence the case law applying either applies.

*maier v. Wooten,* 761 F.2d 46, 48–49 (1st Cir.1985); *Pignons,* 657 F.2d at 486.

## II. Findings of Material Fact

Viewed in a light most favorable to Pump, Inc., the record reveals that a jury could reasonably find the material facts outlined below.[5]

The plaintiff, Pump, Inc., with its headquarters in Norton, Massachusetts, is the owner of a registered service mark with the United States Patent and Trademark Office (Reg. No. 1,498,088), registered on July 26, 1988. The mark depicts the word "Pump," written in lower case, resting on what appears to be two solid dots connected by two parallel lines. *See* appendix "A." The service mark "Pump" was first used in commerce on February 5, 1987— the date of the first performance of the band Pump. It appears on all promotional materials associated with the band Pump. "Pump" stands for "Promoting Unlimited Mind Power." The purpose of the band Pump is to promote physical self-improvement as an alternative to drugs. The four original members of the band were all bodybuilders.

The band Pump has played several concerts in the lower New England area. These concerts were given at high schools in Massachusetts, Rhode Island, and Connecticut. Among the places in which the concerts took place are New Haven, Connecticut; Greenwich, Connecticut; Shelton, Connecticut; Darien, Connecticut; Wayland, Massachusetts; North Attleboro, Massachusetts; and Central Falls, Rhode Island. These high school concerts were done in conjunction with Students Against Drunk Driving (SADD). The band has never played at a major nightclub or concert arena. Pump, Inc. has sold cassette tapes and T-shirts at the band's high-school concerts.

The band Pump has released two singles promoting an anti-drug message, "Cracked" and "White Line Fever." "Cracked" received radio airplay on radio station WHJY in Providence, Rhode Island in May of 1987. The song was played on the Sunday late-night program "Sound Check." "Cracked" and "White Line Fever" can be purchased at the following record stores and gyms: L.A. Records in Norton, Massachusetts; Good Vibrations in Sharon, Massachusetts and in Foxboro, Massachusetts; and Silver's Gym in Franklin, Massachusetts. The band Pump has recorded four other songs—"Pumped," "Lori Ann," "If I Told You," and "Sticks & Stones"—as part of a demo tape which it has sent to radio stations and record companies.

The band Pump also recorded a version and made a video of Elvis Costello's song "Pump It Up." It filmed videos for "Cracked" and "White Line Fever" in March 1987. The filming of Pump's videos was the subject of a front-page article in the March 21, 1987 edition of the North Attleboro *Sun Chronicle,* as well as a piece on the local Channel 6 evening news. Pump, Inc. sent its three videos, along with footage of interviews with the band, to cable television networks, including the national stations Music Television ("MTV") and Colony Interconnect and the local North Attleboro station Visioncable. The videos were subsequently aired on Visioncable and were also picked up by Colony Interconnect.

Through its then-manager, Ganci's brother-in-law Tom Simms ("Simms"),[6] the band Pump mailed letters to over 200 corporations seeking corporate sponsors. No corporation agreed to sponsor the band, although several sent acknowledgment letters. Pump, Inc. did, however, receive letters of recognition supporting its anti-drug

---

**5.** Pump, Inc. has moved to strike the affidavits of Keith Garde, Tim Collins, John Kalodner, and Richard Lehv, submitted by Aerosmith in support of its summary judgment motion. Pump, Inc. argues that these affidavits contain hearsay, are purely speculative, and fail to set forth facts that would be admissible in evidence. Without commenting on the merits of the motion to strike, the Court notes that it has not relied on the affidavits in question in coming to its conclusions. Therefore, the arguments of Pump, Inc. are moot.

**6.** Simms is no longer affiliated with the band Pump, and has not worked for Pump, Inc. in over one year.

stance from former First Lady Nancy Reagan, Arnold Schwarzenegger, Kathleen Sullivan of CBS, and former Boston Celtics player M.L. Carr.

The band Pump was inactive from mid–1988 until shortly after the initiation of this lawsuit. Ganci was in California during August and September, 1989, attempting without success to promote the band. On December 19, 1989, Pump performed live at Alhambras in Westport, Massachusetts and was paid $1,000.

Pump, Inc. has never turned a profit. From 1987 to the present, Ganci has spent approximately $70,000 promoting the band —$20,000 during the past year alone. He has recently reconstituted the band Pump with five new musicians, none of whom are bodybuilders. Ganci presently practices approximately 49 hours per week. Pump, Inc. is presently seeking a record contract and, to this end, it has retained the services of an attorney. Among the record companies that Pump, Inc. has contacted and to which it has sent a demo tape is the defendant Geffen. Pump, Inc. does not presently have a record contract.

Aerosmith is a world-famous rock band that has sold millions of albums worldwide since the early 1970s. Its individual members are the defendants Tyler, Perry, Whitford, Hamilton and Kramer. Aerosmith's songs and videos have been repeatedly played and shown throughout the country. Its concerts routinely sell out large arenas at home and abroad.

The defendant Collins manages Aerosmith. The defendant Geffen distributes the electronic recording by Aerosmith entitled "Pump." The defendant Warner Brothers manufactures the recording.

The Aerosmith logo, consisting of the word "Aerosmith" in stylized form, against the background of a stylized letter "A" with a star and a pair of open wings, appears on all Aerosmith recordings and products. The logo is a federally registered trademark (Reg. No. 1552802), reg-

istered on August 22, 1989 and first used in September 1972.

On September 12, 1989, Aerosmith released to considerable publicity its latest album, entitled "Pump." The album has already sold over 1,800,000 copies in the United States and 600,000 copies abroad, earning it "platinum" honors in the record industry. Its first two single cuts, "Love in an Elevator" and "Janie's Got a Gun," have become hits.

The cover of the Aerosmith "Pump" album portrays one pickup truck driving up on top of another pickup truck from behind. Written on the door of the truck on top, in prominent white capital letters, is the word "Pump." The registered Aerosmith logo is also featured prominently on the cover. See appendix "B." A recent readers' poll in Rolling Stone magazine named the "Pump" cover as one of America's "Best Album Covers" during 1989. Rolling Stone, March 8, 1990, at 38.

As is customary practice in the music industry, Aerosmith has promoted its current tour as "the Pump tour." A newspaper article in the Boston Globe referred to the tour as "the 'Pump' tour." Boston Globe, Dec. 7, 1989, at 98.

There has been recent publicity that Aerosmith's members have given up drugs [7] and have been placing more attention on physical fitness. On an MTV special entitled "Aerosmith Sunday," broadcast on or about November 24, 1989, band member Whitford responded to a reporter's question "Why is the album entitled Pump?" with the comment, "Now that we're off drugs we're all pumped up." Ganci Aff. of Dec. 29, 1989, para. 7.

The band Pump and Aerosmith both appeal to predominantly teenage audiences aged 15–24 but even though the members of the group Aerosmith live near Norton, Massachusetts, where Pump, Inc. is domiciled, there is no evidence that Aerosmith was aware of the band Pump's existence before the institution of this lawsuit.

---

7. *See, e.g.,* Saccone, *Interview with Joey Kramer, Drummer–Percussionist of Aerosmith,* Modern Drummer, Aug. 1988, at 19, 21.

Ganci first learned of the existence of the Aerosmith "Pump" album in mid-September when four acquaintances of his—including the vocalist who had earlier sung background vocals for the band Pump on the song "Pumped" [8]—informed him of the new release and asked him if he was associated with Aerosmith. Ganci told each that there was no connection. None of the four mistakenly thought that the album was a release of the band Pump; all were aware that the recording was an Aerosmith album. No non-acquaintance has expressed any confusion.

Ganci attempted to enforce the service-mark rights at issue here when, on October 4, 1989, acting through counsel, he wrote Collins. Pump, Inc. has not shown any damages as the result of the Aerosmith "Pump" album.

### III. Analysis

Using the above findings of material fact, reflecting a view of the record most favorable to Pump, Inc., as the basis for analysis, the Court must now determine whether there exists a genuine issue as to any material fact in this case. If not, summary judgment in favor of Aerosmith is appropriate.

### A. Service Mark Infringement

Count I of the plaintiff's complaint alleges service mark infringement in violation of the Lanham Act, 15 U.S.C. secs. 1051 *et seq* (1988). The Lanham Act provides in relevant part that:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such

use is *likely to cause confusion,* or to cause mistake, or to deceive ...

. . . . .

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. sec. 1114(1)(a) (emphasis added). Section 1116 in turn states that "[t]he several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions ... to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office...." *Id.,* sec. 1116.[9]

■ The touchstone for analysis in a trademark or service mark infringement case, whether brought under state or federal law, is likelihood of confusion. *Boston Athletic Ass'n,* 867 F.2d at 28; *Astra,* 718 F.2d at 1205; *Pignons,* 657 F.2d at 486–87; *Purolator, Inc. v. EFRA Distributors, Inc.,* 687 F.2d 554, 559 (1st Cir.1982) ("[t]he key element in any infringement action is likelihood of confusion"). Moreover, as Judge Nelson of this District has stated in a meticulously crafted opinion, "the First Circuit has rejected the notion that a possibility, or even a simple likelihood, of confusion suffices to establish a trademark claim. Rather, the Court of Appeals has stated that a *substantial* likelihood of confusion must exist." *Church of the Larger Fellowship v. Conservation Law Foundation of New England, Inc.,* 221 U.S.P.Q. (BNA) 869, 871 (D.Mass.1983) (emphasis in original). *See also Fisher Stoves, Inc. v. All–Nighter Stove Works,* 626 F.2d 193, 194 (1st Cir.1980) ("there must be a substantial likelihood that the public will be confused as to the source of the goods"); *cf. Purolator,* 687 F.2d at 560 (factual findings of district court in granting permanent injunction in infringement case "supported by substantial evidence in the record").

In the "normal" infringement case, a large, well-established senior user seeks to

---

**8.** This individual is Darla Greene ("Greene"). The other three acquaintances are Bonnie Brown ("Brown"), David Lamoreaux ("Lamoreaux"), and Roy Vestutie ("Vestutie").

**9.** Section 1127 defines "service mark" as "a mark used in the sale or advertising of services

to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. sec. 1127 (1988).

prevent a lesser-known junior user from trading off her business goodwill. The likelihood of confusion inquiry "centers on whether members of the purchasing public are likely to mistake defendants' products or services for plaintiffs' protected products or services within the same category." *Boston Athletic Ass'n*, 867 F.2d at 28.

Here, it borders on ridiculous to argue, as counsel for Pump, Inc. did at oral argument, that Aerosmith adopted the name "Pump" in the hope that purchasers would mistake its album for one of the band Pump. A world-famous group such as Aerosmith, enjoying a strong base of loyal teenage support, would have absolutely no reason for stealing the name of an unknown band to sell its records. Indeed, such action would be irrational. The Aerosmith name sells well enough on its own.

■ Rather, Pump's best argument is *reverse confusion*—that in the future, anyone who hears of the band Pump or buys a Pump record will think that the band is sponsored by or affiliated with Aerosmith.[10] In more general terms, this is the case of a little-known senior user being infringed by a more powerful junior user. Given Aerosmith's notoriety, its actions in releasing and promoting the album "Pump" have effectively robbed Pump, Inc. of the ability to use its service mark and have rendered the plaintiff's mark devoid of independent value. Aerosmith has preempted the market with regard to the term "pump." Any time the plaintiff seeks to promote itself by reference to "Pump," consumers will think of Aerosmith first.[11]

In support of its allegations of reverse confusion, Pump, Inc. refers the Court to *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F.Supp. 1219 (D.Colo. 1976), *aff'd*, 561 F.2d 1365 (10th Cir.1977), *cert. denied*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978). In that case, the plaintiff alleged that Goodyear infringed on its trademark "BIG FOOT" for automobile tires by promoting and marketing a custom polysteel radial tire under the name "BIG-FOOT." Goodyear apparently came up with the name "BIGFOOT" innocently enough, but was informed of the plaintiff's "BIG FOOT" tire a month before it instituted a massive nationwide multi-media advertising campaign. When negotiations between the parties failed, Goodyear went ahead with its planned promotion efforts, spending millions of dollars and literally flooding the market. Actual instances of confusion between "BIGFOOT" and "BIG FOOT" tires resulted, with some consumers even believing, mistakenly, that Big O was trading off Goodyear's goodwill—not vice-versa. *Id.* at 1229–30. The district court ruled in favor of the smaller and weaker Big O, stating *inter alia:*

> To permit Goodyear to act in blatant disregard of the plaintiff's position merely because it did not pass off its tires as Big O's would eliminate the protection of a business in the property right to identify itself and its products to the public. While the mere difference in size and economic power between competitors is not unfair, the competition becomes unfair if that power is used with a complete disregard of the property rights of the smaller company.... The destruction of a trademark must surely be an infringement of it.

*Id.* at 1232. The court went on to state:

> The logical consequence of adopting Goodyear's position [that reverse confusion was not actionable] would be the immunization from unfair competition liability of a company with a well-established trade name and with the economic

---

**10.** Indeed, each of the four persons Pump, Inc. puts forth as having been confused by the Aerosmith album inquired as to whether the band Pump was now affiliated with Aerosmith. *See* Greene Aff., para. 8; Brown Aff., para. 6; Lamoreaux Aff., para. 7; Vestutie Aff., para. 4.

**11.** Given its strong anti-drug stance, this confusion could be especially damaging to the band Pump. The Court notes that like many rock bands, Aerosmith has been rumored to be associated with a hedonistic lifestyle and a rather laissez-faire attitude toward substance abuse. *See* note 7 *supra*. The Court expresses no opinion as to the truth of such rumors as they relate to Aerosmith.

power to advertise extensively for a product name taken from a competitor. *Id.* at 1236.

The *Big O* court's acceptance of the concept of reverse confusion has been adopted by other courts, *see, e.g., Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999 (2d Cir.1983); *Capital Films Corp. v. Charles Fries Productions, Inc.*, 628 F.2d 387 (5th Cir.1980); *Elizabeth Taylor Cosmetics Co., Inc. v. Annick Goutal S.A. R.L.*, 673 F.Supp. 1238 (S.D.N.Y.1987); *cf. DeCosta v. Columbia Broadcasting System, Inc.*, 520 F.2d 499 (1st Cir.1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976) (little-known creator of "Paladin" character sues television network for infringement), and has been cited approvingly by at least one treatise. *See* 2 J. McCarthy, *Trademarks and Unfair Competition* sec. 23:1, at 49–50 (2d ed. 1984). While the First Circuit has not expressly adopted the concept of reverse confusion, it has indicated that it would do so under the appropriate circumstances. *Pignons*, 657 F.2d at 492 n. 4.

This Court has no doubt that reverse confusion is actionable. The contrary view would constitute a "return ... to the 19th century view that only passing off is actionable." *Big O*, 408 F.Supp. at 1236. But whether the confusion alleged by the plaintiff is forward or reverse, likelihood of confusion must still be established. *Pignons*, 657 F.2d at 492 n. 4.

 The First Circuit has identified eight factors that must be weighed in assessing likelihood of confusion: (1) the similarity of the service marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark. *Boston Athletic Ass'n*, 867 F.2d at 29; *Volkswagenwerk*, 814 F.2d at 817; *Astra*, 718 F.2d at 1205; *Pignons*, 657 F.2d at

487. No single factor is dispositive; the Court must weigh their cumulative impact. *Volkswagenwerk*, 814 F.2d at 817; *Astra*, 718 F.2d at 1205. The Court now considers the evidence favorable to Pump, Inc. as it applies to each of these factors.

*1. Similarity of the Marks*

 Similarity must be determined "on the basis of the total effect of the designation, rather than a comparison of the individual features." *Boston Athletic Ass'n*, 867 F.2d at 29, quoting *Pignons*, 657 F.2d at 487. It is also clear that the registrant's rights extend beyond its actual mark. *Id.* at 29–30. "When one uses a mark similar to one already in use, there is generally an affirmative duty to avoid the likelihood of confusion." *Id.* at 29; *Volkswagenwerk*, 814 F.2d at 817.

Pump, Inc.'s entire case is premised on the similarity between the name of the plaintiff's band and the title of the latest Aerosmith album. Indeed, both use the word "Pump" prominently, spelled in an identical manner. But the designs differ greatly. The plaintiff's "Pump" is a stylized logo consisting of a pattern of lines resting on what Ganci states are musical notes.[12] "Pump" is written in lower case. *See* appendix "A." Aerosmith, contrariwise, uses "Pump" in a simple manner, with bold capital letters printed on the door of a truck. It does not use the plaintiff's registered logo, and the album cover in no way refers to bodybuilding.

While "phonetically identical," the two marks are used in different contexts and with different visual displays. *See Karmikel Corp. v. May Department Stores Co., Inc.*, 658 F.Supp. 1361, 1372–73 (S.D. N.Y.1987). Significantly, on the Aerosmith album cover the word "Pump" is displayed in clear conjunction with the distinctive, registered Aerosmith logo. *See* appendix "B." Even Bonnie Brown ("Brown"), Darla Greene ("Greene"), David Lamoreaux ("Lamoreaux") and Roy Vestutie ("Vestutie"), who testify to confusion, admit in

---

**12.** Aerosmith claims that these "musical notes" actually represent a barbell. *See* Memorandum in Support of Defendants' Motion for Summary

Judgment at 3. For purposes of resolving this motion, however, the Court accepts Ganci's representations.

their affidavit and deposition testimony that they also saw the Aerosmith mark. Hence, the "otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer." *Astra,* 718 F.2d at 1205; *Pignons,* 657 F.2d at 487. *See also Kazmaier,* 761 F.2d at 50; *Purolator,* 687 F.2d at 561 ("[c]lear and prominent display of the name of the true manufacturer, while not determinative, can substantially mitigate any confusion...."); *Church of the Larger Fellowship,* 221 U.S. P.Q. at 872 (same).

The presence of the Aerosmith logo in conjunction with the "Pump" name would therefore seem to render any similarity between the marks inconsequential. The Court, however, is mindful of its duty to consider the evidence in a light most favorable to Pump, Inc. So doing, the Court cannot for purposes of this review state that the two "Pump" marks are dissimilar. *Cf. Astra,* 718 F.2d at 1205 (marks similar despite prominent presence of defendant's name next to mark in question). This similarity, though, is tenuous, based solely on the use of the same word. Alone, it does not mandate a finding of likelihood of confusion.

### 2. Similarity of the Goods

The parties offer the same services ("goods") to the public—musical entertainment. Aerosmith, however, points out that while they use the term "Pump" as the title of an album, the plaintiff uses it as the name of a band. True, this is the primary use of the mark by Pump, Inc., but this is not its sole use. Pump, Inc. also uses its service mark on T-shirts and cassettes that it has sold at its high-school concerts. The mark appears on the 45 r.p.m. single containing the songs "Cracked" and "White Line Fever," as well as on the band's videos. In short, Pump, Inc. uses its mark "Pump" in the same manner as Aerosmith uses its registered mark "Aerosmith"—to promote and identify the band and its recordings. Aerosmith's argument to the contrary ignores the fact that both parties use the term "Pump" to promote a wide array of goods and services associated with musical entertainment.[13]

Viewing the evidence in a manner most favorable to Pump, Inc., therefore, the Court rules that the parties' goods and services are similar.

### 3. Channels of Trade, Advertising and Prospective Purchasers

The Court discusses these three factors together, as courts in this circuit generally do. *See Boston Athletic Ass'n,* 867 F.2d at 30; *Astra,* 718 F.2d at 1206; *Pignons,* 657 F.2d at 488.

Aerosmith argues vehemently that the parties do not have the same channels of trade, advertising or customers. They assert that Pump, Inc. is a gimmick group of singing bodybuilders that have an audience limited to persons interested in bodybuilding, whereas Aerosmith is an internationally known and popular band with widespread audience appeal.

These factors, however, cut in favor of Pump, Inc. as well. The differences between the parties are of degree, not of kind. The Court is already familiar with Aerosmith's music and has listened carefully to the tape supplied by Pump, Inc. Accordingly, even a tone deaf middle-aged judge whose musical tastes incline toward folk melodies can here rule confidently that both the band Pump and Aerosmith are rock groups playing roughly similar kinds of music.[14] Aerosmith, moreover, depends on music store sales, radio and video royalties, and live concert proceeds for its profits. Pump, Inc. seeks precisely this—which is why it has attempted to obtain a recording contract. Both bands either advertise or intend to advertise through posters, T-shirts, jewelry, and media exposure. Finally, both have a nearly identical class of

**13.** The Court notes that the term "Pump" as used by Aerosmith does not appear solely on the most recent Aerosmith recording—it also appears on T-shirts and other materials promoting the band's latest tour. *See* Ganci Aff., Ex. "A."

**14.** The Court expresses no opinion as to the relative virtues, or lack thereof, of each band's music.

prospective purchasers: young persons who enjoy rock music.[15]

In determining whether the parties use the same channels of trade and advertising and have the same class of prospective purchasers, the relative success or failure of either party in advertising or in reaching potential customers is simply immaterial. Aerosmith's greater success in reaching teenage rock-and-roll fans has no bearing on whether it and the band Pump use the same channels of trade and advertising and enjoy the same class of prospective purchasers. The key here is not which group is more popular or which group tours more or which group has made more money—but rather whether the parties have similar potential markets and seek to exploit those markets in similar ways.

Viewing the evidence favorably to Pump, Inc., it satisfies this standard. A contrary ruling would, in effect, insulate better known, more successful parties from challenge whenever they attempt to steal names or ideas from unknown parties with limited market strength. Consequently, these factors favor Pump, Inc.

### 4. Evidence of Actual Confusion

Evidence of actual confusion "is not invariably necessary to prove likelihood of confusion." *Pignons*, 657 F.2d at 490; *Volkswagenwerk*, 814 F.2d at 818. The absence of evidence of actual confusion, however, is certainly relevant to a finding of little likelihood of confusion. *See id.; Pignons*, 657 F.2d at 490.

Pump, Inc. has presented four affidavits as proof of actual confusion. *See* Greene Aff.; Brown Aff.; Lamoreaux Aff.; Vestutie Aff. The four allegedly confused persons give, interestingly, nearly identical accounts. Greene and Brown saw displays of the Aerosmith "Pump" album in record stores; Lamoreaux and Vestutie heard of the album on the radio. Each alleges that

he or she was confused as to the association of the band Pump with the "Pump" album and enquired of Ganci as to any possible affiliation. Ganci informed each that there was no connection whatsoever.

Several considerations weigh against a finding of actual confusion in this case. First, each of the four admitted that he or she was aware that the "Pump" album was an Aerosmith album. Greene saw the Aerosmith logo next to the word "Pump." Greene Aff., para. 6. Brown admitted in her deposition that she saw the Aerosmith logo "displayed in connection with the word 'Pump.'" Brown Dep. at 29. Lamoreaux, in his deposition, admitted that he "heard the DJ saying something about Aerosmith and their coming out with a new album 'Pump.'" Lamoreaux Dep. at 12. Vestutie admitted the same. Vestutie Aff., para. 3. By their own admissions, therefore, none of the persons presented by the plaintiff as evidence of actual confusion mistakenly thought that the "Pump" album was released solely by the band Pump. Each was aware that it was an Aerosmith recording. If anything, their testimony demonstrates a lack of confusion.

Second, the mere enquiries of Ganci as to any affiliation between Aerosmith and the band Pump, while relevant, is insufficient evidence of actual confusion. "Such enquiries alone reveal a less than totally 'confused' state of mind of the enquiring persons." 2 J. McCarthy, sec. 23:2, at 54. *See also Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482 (10th Cir.1987); *Freedom Savings & Loan Assoc. v. Way*, 757 F.2d 1176 (11th Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985). *Cf. Pignons*, 657 F.2d at 490 (enquiry as to affiliation relevant to issue of confusion, but only one such incident was "clearly insufficient"). Crucially, Ganci himself alleviated any confusion by informing them that there was no connection between the two bands.

---

**15.** Aerosmith argues that consumers exercise a great deal of care in purchasing albums. While many fans are clearly loyal to their favorite bands, this Court takes judicial notice, Fed.R. Evid. 201, that compact discs and records are relatively inexpensive goods that are most often purchased by the casual purchaser without careful consideration, leading to a greater potential for confusion. *See Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 489 (1st Cir.1981).

Third, each of the four persons is a friend or acquaintance of Ganci's. Greene, for example, sang background vocals in recording the song "Pumped." While "the fact that ... these incidents involved [friends of Ganci's] does not make [them] less relevant," *Boston Athletic Ass'n*, 867 F.2d at 31 n. 8 (indeed, it explains why they went to Ganci directly), it does make their testimony less probative of actual confusion. There is not a shred of evidence in the record that anyone unaffiliated with Ganci or Pump, Inc. was confused by the appearance of the Aerosmith album—either that Aerosmith's album was in fact the band Pump's or that Pump, Inc. was now working with Aerosmith to promote an anti-drug message. There is simply no evidence that anyone ever bought the Aerosmith album thinking that it came from the band Pump.

This factor favors Aerosmith.[16]

### 5. Aerosmith's Intent in Adopting the Mark

Pump, Inc. has presented no evidence that Aerosmith intentionally appropriated the plaintiff's mark "Pump." Nor has it presented evidence that any of the defendants were even aware of the band Pump's existence before the filing of this lawsuit. The closest that Pump, Inc. comes in this regard is a rather cryptic allegation that

the individual members of Aerosmith live "within a seven mile radius of Norton, Massachusetts," where Pump, Inc. has its headquarters. *See* Ganci Aff. at 2.

■■■ Even if true, this inference upon inference does not demonstrate bad faith. There is no evidence in the record that Aerosmith intended to "reap what it had not sowed" by appropriating the band Pump's name and concurrent goodwill on its new album—in other words, that it wanted a "free ride." *International News Service v. Associated Press*, 248 U.S. 215, 239, 39 S.Ct. 68, 72, 63 L.Ed. 211 (1918) (Holmes, J.). This lack of evidence is consistent with common sense—why would a world-famous band with proven market power rely on the name of an unknown group of bodybuilders to help promote its product? This factor favors the defendants as well.[17]

### 6. Strength of the Plaintiff's Mark

" 'Strong' marks are accorded broader protection against infringement than are 'weak' marks." *Volkswagenwerk*, 814 F.2d at 819; *Pignons*, 657 F.2d at 492.

The First Circuit has looked to the following factors in determining the strength of a plaintiff's mark: (1) the length of time it has been used and the plaintiff's renown in its field; (2) the strength of the mark in the field; and (3) the plaintiff's actions in

**16.** In the *Big O* case, by contrast, there was abundant evidence of actual confusion. Customers who had already purchased the Big O "BIG FOOT" tire when Goodyear began marketing its "BIGFOOT" tire thought that their tires were manufactured by Goodyear for Big O. Several Big O customers asked their dealers if they were affiliated with Goodyear. The most clear example occurred when a Big O dealer attempted to place an advertisement in the Yellow Pages using the phrase "Home of BIG FOOT." The telephone company representative refused the ad, however, because the name BIG-FOOT already belonged to Goodyear. *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F.Supp. 1219, 1229 (D.Colo.1976), *aff'd*, 561 F.2d 1365 (10th Cir.1977), *cert. denied*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978).

**17.** This lack of bad faith contrasts sharply with the deliberate actions of Goodyear in *Big O*. Goodyear knew of the plaintiff's asserted right to the name "BIG FOOT" at least one week

before it commenced its massive advertising campaign, giving it adequate time to delete the infringing use. Yet Goodyear chose instead "to ignore completely the property rights of Big O." 408 F.Supp. at 1233. Indeed, both the district court and the court of appeals held that "the evidence [was] sufficient to warrant a determination beyond a reasonable doubt that Goodyear acted with a wanton and reckless disregard of the rights of the plaintiff." *Id.; see Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1374–76 (upholding district court's finding of sufficient evidence to support jury's finding of damages but reducing punitive damages award from $16.8 million to $4 million).

While Pump, Inc. correctly points out that good faith is no defense to a service mark infringement case *if* consumer confusion is otherwise present, *see Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir.1986), this Court has already ruled that no adequate showing of consumer confusion has been made here. *See supra*, pt. III(A)(5).

promoting its mark. *Boston Athletic Ass'n,* 867 F.2d at 32; *Volkswagenwerk,* 814 F.2d at 819.

Judged against these factors, the mark of Pump, Inc. is extremely weak. Giving Pump, Inc. every benefit of the doubt, the mark has only been in use since early 1987, and the band's failure to get a record contract indicates that neither it nor the mark is well-known in the music industry. Certainly Pump, Inc. has pointed to no evidence to the contrary. Until December 19, 1989, the band's only concerts—totalling at most twenty—were at local high schools as part of anti-drug rallies. Moreover, Ganci's efforts to promote Pump, admittedly substantial from a personal point of view, apparently ended sometime in 1988, and were only rekindled in recent months. The band itself was inactive from 1988 until after the institution of this lawsuit.

Again, this factor favors Aerosmith.[18]

### 7. Summary

Weighing each of the eight factors examined above, the Court concludes that Pump, Inc. has failed to demonstrate any likelihood of confusion, much less a substantial one. While there is some surface similarity between the marks themselves, and while the parties offer similar services and utilize similar means of reaching similar audiences, the Court is swayed by the following factors: the dissimilar manner in which the word "Pump" is used by the parties; the weak evidence of actual confusion; the weakness of the mark of Pump, Inc.; and Aerosmith's lack of bad faith. Consequently, summary judgment in favor of Aerosmith is appropriate on the claim of service mark infringement.

This holding is fully consistent with a line of First Circuit cases granting summary judgment in infringement actions. *See Volkswagenwerk,* 814 F.2d at 819 (affirming summary judgment in favor of plaintiff); *Kazmaier,* 761 F.2d at 50–51 (affirming summary judgment in favor of defen-

dant on claim that defendant had infringed on plaintiff's valid trade name "the World's Strongest Man"); *Astra,* 718 F.2d at 1209 (granting of summary judgment affirmed in action by pharmaceutical company to enjoin defendant from using plaintiff's registered mark "Astra" on its computerized blood analyzer machine); *Pignons,* 657 F.2d at 492 (affirming summary judgment in favor of defendant in action alleging that defendant's use of word "alpha" infringed plaintiff's trademark "alpa").

### B. Unfair Competition

Count IV of the complaint charges that Aerosmith's use of its mark "Pump" constitutes unfair competition in violation of common law principles.

In the First Circuit, a plaintiff must support a charge of unfair competition with a showing of likelihood of confusion. *Pignons,* 657 F.2d at 493. The Court's conclusion that there is no likelihood of confusion regarding service mark infringement is fatal to Pump, Inc.'s unfair competition claim as well. *Id.; Astra,* 718 F.2d at 1209.

Summary judgment is therefore warranted on this claim.

### C. Unauthorized Use of a Name

Count II alleges that Aerosmith used the plaintiff's mark "Pump" for advertising and trade purposes without its consent, in violation of Mass.Gen.L. ch. 214, sec. 3A (1986). The relevant statutory provision is as follows:

> Any person whose name, portrait or picture is used within the commonwealth for advertising purposes or for the purposes of trade without his written consent may bring a civil action in the superior court against the person so using his name, portrait or picture, to prevent and restrain the use thereof; and may recover damages for any injuries sustained by reason of such use.

Mass.Gen.L. ch. 214, sec. 3A [hereinafter "section 3A"]. The Massachusetts Su-

---

18. *Cf. Big O,* 408 F.Supp. at 1239 (prior to Goodyear's infringing use, the Big O "BIG FOOT" tires were on sale at Big O dealerships in Oregon, Washington, California, Idaho, Utah, Neva-da, Arizona, Colorado, New Mexico, Kentucky, North Carolina and South Carolina; new dealerships offering the tires subsequently opened in Illinois, Michigan and Virginia).

preme Judicial Court has interpreted the interest protected by section 3A as "the interest in not having the commercial value of one's name, portrait or picture appropriated to the benefit of another." *Tropeano v. Atlantic Monthly Co.*, 379 Mass. 745, 749, 400 N.E.2d 847, 850 (1980).

The Court is aware of no case, and Pump, Inc. has pointed to none, in which section 3A has been used by a corporate plaintiff to prevent the use of a registered trademark. Rather, the paradigm case under section 3A involves a private plaintiff who sues following the defendant's use of "the plaintiff's name, portrait or picture deliberately to exploit its value for advertising or trade purposes." *Id.*[19] In *Tropeano*, for example, the plaintiff was a woman whose picture was used without her consent as an illustration to an article dealing with modern sexual and social mores. 379 Mass. at 746, 400 N.E.2d at 848.

■■■ The Court expresses grave doubt as to whether section 3A provides an available remedy in this commercial context. The Court notes that the Massachusetts legislature has already provided ample remedies for such wrongs through Mass. Gen.L. ch. 93A, sec. 11 (deceptive trade practices) and Mass.Gen.L. ch. 110B, sec. 11 (trademark infringement). Section 3A is designed to apply to the misappropriation of private names and likenesses, not commercial names and trademarks. It appears that Pump, Inc. is attempting to force a square peg in a round hole.

Fortunately, the Court need not rule whether the plaintiff has stated a valid cause of action under section 3A to deal with this issue. Assuming that Pump, Inc. has stated a valid claim—a matter on which this Court expresses no opinion—Pump, Inc. must still demonstrate a genuine issue

of material fact in order to survive summary judgment.

■■■ Looking at the evidence presented and drawing all inferences in its favor, Pump, Inc. has not established any genuine issue as to the unauthorized use of its name. Although the Massachusetts courts have not yet delineated the elements a plaintiff must prove under section 3A, the *Tropeano* case makes clear that at a minimum a plaintiff must show that the defendant used its name *"deliberately* to exploit its value for advertising or trade purposes." 379 Mass. at 749, 400 N.E.2d at 850 (emphasis added). As the Court concluded above, Aerosmith did not act in bad faith in adopting the name "Pump" for its new album. Indeed, there is not a scintilla ᷅ of evidence in the record that Aerosmith had even heard of the band Pump when it named the album. This lack of intent is fatal to any claim Pump, Inc. might have under section 3A.

Accordingly, summary judgment is appropriate on Count II.

### D. Deceptive Trade Practices

■■■ Finally, Count III of the plaintiff's complaint alleges that Aerosmith's use of its mark "Pump" constitutes an unfair method of competition and a deceptive trade act or practice. The relevant statutory framework, Mass.Gen.L. ch. 93A, sec. 2(a) (1986), states simply that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Section 11 in turn allows any person injured as the result of such unfair or deceptive acts or practices to bring a civil action for damages or injunctive relief in the superior court. Mass.Gen.Laws ch. 93A, sec. 11.

**19.** This is the use to which the New York Civil Rights Law, on which the Massachusetts statute is based, has been most commonly used. *See* N.Y.Civ.Rights Law secs. 50–51 (McKinney 1976 & Supp.1979); *Tropeano v. Atlantic Monthly Co.*, 379 Mass. 745, 746–49, 400 N.E.2d 847, 848 (1980). Note while New York courts have held that the New York Civil Rights Law authorizes in certain circumstances a remedy against the press and other media which publish the names,

pictures and portraits of persons without their consent, *see Time, Inc. v. Hill*, 385 U.S. 374, 381–82, 87 S.Ct. 534, 538, 17 L.Ed.2d 456 (1967), the Massachusetts Supreme Judicial Court has limited the applicability of section 3A in such right-of-privacy situations. *See Tropeano*, 379 Mass. at 748–49, 400 N.E.2d at 849–50 (noting the existence of a separate Massachusetts statute to deal with the right to privacy).

The question in an action based on chapter 93A is simply "did [the defendants] do anything unfair or deceptive?" *Professional Economics, Inc. v. Professional Economic Services, Inc.*, 12 Mass.App.Ct. 70, 80, 421 N.E.2d 1221, 1227 (1981). Chapter 93A itself provides no definition of what constitutes an unfair act or practice. *See PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 595, 321 N.E.2d 915, 917 (1975). It seems, however, that section 2(a) essentially incorporates two causes of action: unfair competition and use of deceptive trade practices.

Regarding the former, in defining what is "unfair" Massachusetts courts look to the following factors drawn from Federal Trade Commission guidelines:

(1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness;
(2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Purity Supreme, Inc. v. Attorney General*, 380 Mass. 762, 777, 407 N.E.2d 297, 307 (1980) (quoting 29 Fed.Reg. 8355 [1964]). Regarding the latter, a practice may be "deceptive" under chapter 93A if it " 'could reasonably be found to have caused a person to act differently from the way he otherwise would have acted.' " *Kazmaier*, 761 F.2d at 51 (quoting *Purity Supreme*, 380 Mass. at 777, 407 N.E.2d at 307).

Considering the evidence in a manner favorable to Pump, Inc., the Court is not persuaded that a reasonable jury could find that any of Aerosmith's actions were "unfair" or "deceptive" for purposes of chapter 93A. Surely Ganci was not fooled. *See Kazmaier*, 761 F.2d at 51 (fact that plaintiff was not himself deceived considered by court in granting summary judgment for defendant on chapter 93A claim). Nor has any consumer, independent or otherwise, suffered "substantial injury" as the result of Aerosmith's actions. Pump, Inc. has presented no evidence that any consumer mistakenly purchased the Aerosmith album thinking that it was recorded by the band Pump.

More crucially, the Court's analysis in parts III(A–C) of this opinion makes clear that Aerosmith was fully within its rights to use the name "Pump" for its most recent recording. *See id.* As such, even under the most critical view, Aerosmith's actions can hardly be described as "immoral, unethical, oppressive, or unscrupulous." *Purity Supreme*, 380 Mass. at 777, 407 N.E.2d at 307.

Consequently, summary judgment for Aerosmith is appropriate on the chapter 93A claim.

## IV. Conclusion

For the above reasons, the defendants' motion for summary judgment was ALLOWED. In holding that there is no genuine issue as to any material fact in this case, however, the Court by no means wishes to disparage the band Pump or its strong stance against drug and alcohol abuse. On the contrary, the Court commends Pump for its efforts and wishes it future success. But the law is settled and the relevant facts are clear. The weight the plaintiff must press to survive summary judgment is a heavy one indeed, and its case simply was not pumped enough. Pump may continue its quest to promote unlimited mind potential, but unfortunately this Court's potential powers are limited by the commands of the law and the dictates of common sense.

SO ORDERED.

Int. Cl.: 41

Prior U.S. Cl.: 107

**United States Patent and Trademark Office**
Reg. No. 1,498,088
Registered July 26, 1988

## SERVICE MARK
### PRINCIPAL REGISTER

PUMP INC. (MASSACHUSETTS CORPORA-
TION)
P.O. BOX BL
NORTON, MA 02766

FOR: ENTERTAINMENT SERVICES IN THE
NATURE OF A MUSICAL GROUP, IN CLASS
41 (U.S. CL. 107).

FIRST USE 2-5-1987; IN COMMERCE
9-7-1987.

SER. NO. 696,723, FILED 11-23-1987.

AMOS T. MATTHEWS, JR., EXAMINING AT-
TORNEY

APPENDIX "B"

